1  KAUFHOLD GASKIN LLP
   STEVEN S. KAUFHOLD, ESQ. (SBN 157195)
2  Email: SKaufhold@KaufholdGaskin.com
   JONATHAN B. GASKIN, ESQ. (SBN 203625)
3  Email: JGaskin@KaufholdGaskin.com
   RUTH L. HAWLEY, ESQ. (SBN 253112)
4  Email: RHawley@KaufholdGaskin.com
   QUYNH K. VU, ESQ. (SBN 286631)
5  Email: QVu@KaufholdGaskin.com
   388 Market St., Suite 1300
6  San Francisco, CA 94111
   Telephone: 415-445-4620
7  Facsimile: 415-874-1071

8  Attorneys for Defendants Windsor Surry
   Company and Windsor Willits Company
9

10

11                  UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15  McLANE COVER, on behalf of himself and     )  Case No.: 3-14-05262 -WHO
    all others similarly situated,             )
16                                             )
                                               )  **DEFENDANTS' REQUEST FOR**
17                   Plaintiff,                )  **JUDICIAL NOTICE IN SUPPORT OF**
                                               )  **MOTION TO DISMISS SECOND**
18           vs.                               )  **AMENDED COMPLAINT**
                                               )
19  WINDSOR SURRY COMPANY and                  )
    WINDSOR WILLITS COMPANY                    )  Date:       November 18, 2015
20                                             )  Time:       2:00 p.m.
                   Defendants.                 )  Judge:      Hon. William H. Orrick
21                                             )  Courtroom:  2
                                               )
22                                             )
                                               )
23                                             )
                                               )
24                                             )
                                               )
25                                             )
                                               )
26  _____ )

27

28

## I.     <u>INTRODUCTION</u>

Defendants Windsor Surry Company and Windsor Willits Company ("Defendants") request judicial notice of the following documents:

1)     Exhibit 1 is a true and correct copy of Defendants' Limited Express Warranty from its marketing materials.  It only warrants the glue and primer; states that the only remedy is replacement of the product; that no other damages, including consequential damages, are recoverable; and specifically disclaims all other potential warranties, including the implied warranty of merchantability.

2)     Exhibit 2 is a true and correct copy of a page entitled "Wood Specie Decay Resistance" from Defendants' website in March 2004.  This page contains information from the "Wood Handbook" published by the Forest Products Laboratory, and categorizes wood types by their decay resistance.  This page on Defendants' website communicated to prospective buyers, including Plaintiff, that the Radiata pine Defendants used in their products was only "slightly or nonresistant" to decay.

3)     Exhibit 3 is a true and correct copy of ASTM D2559-04, the 2004 Standard Specification for Adhesives for Structural Laminated Wood Products for Use Under Exterior (Wet Use) Exposure Conditions which specifies the standard for adhesives used for structural laminated wood products for general construction, for marine use, or for other uses where a high-strength, waterproof adhesive bond is required.

4)     Exhibit 4 is a true and correct copy of ASTM D5572-95, the Standard Specification for Adhesives Used for Finger Joints in Nonstructural Lumber Products, which applies to, *inter alia*, exterior mouldings, window and door component or parts, and bonded-lumber panels.  This standard was effective at the time Plaintiff purchased Defendants' product.

5)     Exhibit 5 is a true and correct copy of *Hoekman v. Tamko Building Products*, 2:14-cv-01581-TLN-KJN (E.D. Cal. August 26, 2015), which at the time of this filing was not yet published on Westlaw.

## II.   <u>ARGUMENT</u>

Exhibits 1- 4 are judicially noticeable for multiple reasons.  First, all the documents are incorporated by reference into the Second Amended Complaint ("SAC").  Second, Exhibits 1-2 are from Defendants' website and are publicly available on the internet, so the existence of the documents and their contents is a matter of public record.  Third, Exhibits 3-4 are technical standards that can be accurately and readily determined, and whose accuracy cannot be reasonably questioned.  Finally, Exhibit 5 is a recently issued judicial opinion from the Eastern District of California; it is attached to this request for judicial notice for the Court's convenience, as it is not yet available on Westlaw.

### A.     The Court Should Take Judicial Notice of Exhibits 1-4 Because They are Incorporated by Reference Into the Second Amended Complaint.

As explained by this Court in *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 2013 WL 6441843, at *5, 12-CV-06039-WHO (N.D. Cal., Dec. 9, 2013):

> Pursuant to Federal Rule of Evidence 201, documents alleged in a complaint and essential to a plaintiff's allegations may be judicially noticed.  *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1295 (9th Cir.1998).  "Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."  *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.2010) (internal quotation marks and citation omitted).  The court may "treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006).  A court may also take judicial notice of documents on which allegations in the complaint necessarily rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents are not in dispute.  *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 837–38 (N.D.Cal.2000).

*See also United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003) ("[E]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

Here, Plaintiff has incorporated Exhibits 1-4 into the SAC, and the documents form the basis of all of Plaintiff's claims.  Exhibits 1 and 2 are from Defendants' website, and are part of Defendants' advertising and marketing materials, which Plaintiff repeatedly refers to and quotes from throughout the SAC.  *See* SAC ¶¶ 31-39 (repeatedly discussing and quoting from Defendants' marketing materials).  For example, Plaintiff alleges that "Defendants' [sic] distributed marketing material including *a website*, printed materials, and electronic media . . ." to him.  SAC ¶ 66 (emphasis added).  Plaintiff alleges that he and his agents were "familiar" with the marketing materials and that his architect "was very strongly influenced by Defendants' marketing materials" when the decision to install Defendants' product was made.  SAC ¶¶ 67, 69.  Plaintiff even makes a list of direct quotes from Defendants' website and other marketing materials, and expressly realleges and incorporates by reference this list in each and every one of his causes of action.  *See* SAC ¶ 104 (list of ten "marketing representations") ¶¶ 106, 113, 129, 142, 154, 163 (incorporating these allegations by reference into each cause of action).  Plaintiff explicitly relies on these statements from Defendants' website and marketing materials as the basis for his claims.  *See* SAC ¶¶104, 108, 121-25, 131-34 (explicitly alleging that marketing statements and warranties form the basis of various claims).  Accordingly, Defendants are entitled to judicial notice of Exhibits 1 and 2 to contextualize the statements that Plaintiff has cherry-picked from Defendants' marketing materials.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (taking judicial notice of contents of surrounding webpages to a webpage described by plaintiff to contextualize purported defamatory statement).

With respect to Exhibit 1—Defendants' limited express warranty—the incorporation by reference is blatant, as Plaintiff not only discusses the warranties in the SAC, but also brings a causes of action for Breach of Express Warranty.  *See* SAC ¶¶ 59, 67, 88 (citing express warranty); SAC ¶ 139 (cause of action for Breach of Express Warranty premised on Defendants' "10-year express warranty").  Judicial notice is warranted for this reason as well.  *See also Hoey v. Sony Electronics Inc.*, 515 F. Supp. 2d 1099, 1103 (N.D. Cal. 2007) (taking judicial notice of warranty because plaintiff's complaint is based directly on it).

Similarly, Exhibits 3 and 4 are incorporated by reference in the SAC and underly Plaintiff's assertion that Defendants should have followed Standard D2559 rather than D55-72-95—an assertion that forms the basis of most of Plaintiff's product defect claims.  SAC ¶¶ 44-45.  Judicial notice of these exhibits is also warranted.

**B.     The Court Should Also Take Judicial Notice of Exhibits 1 and 2 Because They Are Publicly Available On the Internet.**

Exhibits 1 and 2 are also judicially noticeable for another independent reason—they are true and correct copies of pages from Defendants' website, and therefore their existence is a matter of public record.  Courts may take judicial notice of the existence of publicly available information, including pages on the Internet.  For example, this Court has held that the existence of webpages constitute public records subject to judicial notice.  *See, e.g., Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 983-84 (N.D. Cal. 2010) (granting request for judicial notice in webpages are judicially noticeable "for the fact that they exist"); *Wible v. Aetna Life ins. Co.*, 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005) (taking judicial notice of the website of the American Academy of Allergy Asthma Immunology organization and of the contents of Amazon.com web page describing books related to the case).

For these publicly available marketing materials, judicial notice is requested only for their existence and the existence of their contents, but not for the truth of their contents.  *See, e.g.*, *Rieckborn v. Jefferies LLC*, 81 F.Supp.3d 902 (N.D. Cal. 2015) (Orrick, J.).

**C.     The Court Should Take Judicial Notice of Exhibits 3 and 4 Because They Are Established Standards That Can Be Accurately and Readily Determined From Sources Whose Accuracy Cannot Reasonably be Questioned.**

Finally, Exhibits 3 and 4 are also judicially noticeable because they are established technical standards published by ASTM International (formerly known as the American Society for Testing and Materials).  Judicial notice of the standards is appropriate because ASTM publishes the standards, so they can be accurately and readily determined, and their accuracy cannot reasonably questioned.  *See* Fed. R. Evid. 201(b); *City of Dearborn Heights*, 2013 WL 6441843, at *5 (taking judicial notice of accounting standards issued by the Accounting Standards Board); *Rieckborn*, 81 F.Supp.3d 902 (taking judicial notice of accounting standards

issued by the Financial Accounting Standards Board and the American Institute of Certified Public Accountants).

**D.     The Court Should Take Judicial Notice of Exhibit 5 Because It is a Judicial Opinion.**

Exhibit 5 is a recently issued judicial opinion, *Hoekman v. Tamko Building Products*, 2:14-cv-01581-TLN-KJN (E.D. Cal. August 26, 2015).  At the time of this filing it was not yet published on Westlaw, and it is attached to this request for judicial notice for the Court's convenience.

### III.     <u>CONCLUSION</u>

For the reasons explained above, Defendants respectfully request that the Court take judicial notice of the attached Exhibits 1 through 5.


Respectfully submitted,

Date: September 14, 2015                    KAUFHOLD GASKIN LLP

                                            By:  /s/ Jonathan Gaskin
                                                 Jonathan Gaskin

EXHIBIT 1



*Wood in its Prime*

# Recommended Handling, Storage, & Installation Practices

## Handling & Storage

WindsorONE is not responsible for changes in our products due to environmental conditions during or after installation. Until installed, WindsorONE needs protection from direct sunlight, water saturation, dirt and other elements.  WindsorONE should be stored in a dry location off of the ground on blocks and be protected with a waterproof cover.  Do not completely seal the bundle, as good air circulation is required.

## Outdoor Installation

All WindsorONE should be installed according to the highest Industry Standards.  Windsor Mill endorses the following practices to promote optimal performance of WindsorONE products.

- Avoid marring and scuffing WindsorONE during cutting and handling.

- Do not install WindsorONE boards as siding.

- All end and edge cuts must be re-coated to help limit water migration which may contribute to swelling, grain raise, warping, twisting, cupping, extractive bleeding, and long-term peeling problems.

- Avoid miter cuts in exterior applications.

- Use high performance acrylic-latex, silicone acrylic, or urethane caulks and sealants to seal end cuts or gaps around windows, doors, corners, and other exterior joints that are exposed to potential water intrusion.

- Wherever possible, avoid three-sided adhesion. The caulk should only adhere to the two surfaces that make the crack in the surface plane, not any rigid substrate behind. Backer rod should be inserted in to gaps where caulk seals are to be made, and then caulked over.

- Use stainless steel or aluminum nails to prevent discoloration.  Hot dipped galvanized nails also work very well.

- Hand nailing is recommended to avoid overdriving nails that can break factory finish seal. Special care needs to be taken if you are going to use a nail gun. Precise adjustment of nail depth is very important.

- Do not install against cement and install at least 8 inches above the ground level to prevent moisture or pest damage.

- Trim should be designed to shed water.

---



a Windsor Mill company

8711 Bell Road
P.O. Box 39
Windsor, CA 95492
Phone: 888.229.7900
Fax: 707.838.8704
**www.WindsorONE.com**



*Wood in its Prime*

- Vertical trim pieces should not have exposed end grain.

- Use the "Rain Screen" method. Windsor Mill recommends Benjamin Obdyke's Home Slicker. Learn more at http://www.benjaminobdyke.com. If Home Slicker cannot be used, substitute vertical furring strips.

- Columns wrapped in WindsorONE should be constructed to incorporate an "air cavity" between the WindsorONE substrate and the underlying core. Ventilation and drain holes need to be included at the top and bottoms to ensure proper air flow. E-mail us for column installation instructions.

## Again, follow the Highest Industry Standards.

### Indoor Installation
WindsorONE is not responsible for changes in our products due to environmental conditions during or after installation. The indoor installation of WindsorONE requires special care, as the product should be installed only after the moisture content of the wood is brought into equilibrium with the internal environment. This can be achieved by storing the product in the same indoor environment where the product will be installed. The longer the time period the product is able to stabilize with the internal environment the less potential there is for product shrinking, enlarging, cupping, or warping after installation. We recommend a minimum of 7 days.

### Painting
Apply a topcoat as soon as possible and follow the highest industry wood and paint product practices. Apply paint according to manufacturers specifications and their recommended spread rates. Do not use paints with vinyl-based resin combinations. Brush application of primers and top-coats ensures best coverage and protection. For best top-coat results, apply two coats of a high quality, 100% acrylic latex paint. With WindsorONE Trim, builders have the flexibility to top-coat up to one year after installation. If WindsorONE material cannot be finished within one year, clean surface and re-prime with a quality, alkyd-based wood primer.

### Recommended Reading:
"**The Rehab Guide: Volume 2 - Exterior Walls**," by the U.S. Department of Housing and Urban Development – Prescribes proper wood products and Regional State codes for construction practices.
"**Carpentry: Third Edition**," written by Leonard Koel and published by American Technical Publishers, Inc
"**Exterior Finishes for Wood**," written and published by The Forrest Products Laboratory.
Further references can be found on our website's "Frequently Asked Questions" and "Resources" areas.

### Limited Warranty:
Windsor Mill guarantees WindsorONE's end and edge gluing for 10 years and it's priming for 5 years. Windsor Mill will replace, without charge, any WindsorONE product found to be defective within that time. Such replacement is the exclusive remedy for any defect, with no consequential damages recoverable. See WindsorONE Warranty at www.WindsorONE.com.

**For any further questions on installation techniques or ideas, please contact craig@WindsorONE.com or check out our website at www.WindsorONE.com.**



a Windsor Mill company

8711 Bell Road
P.O. Box 39
Windsor, CA 95492
Phone: 888.229.7900
Fax: 707.838.8704
www.WindsorONE.com

INTERNET ARCHIVE
WayBack Machine

http://windsorone.com/warranty.asp?section=Remodeler    Go

MAY    **DEC**    F
◄    **20**    ►
2003    2004    2

**15 captures**
30 Jan 03 - 6 Oct 07

WindsorONE    *Wood in its Prime*

## Remodeler

Products    Dealer Locator    Resources    News & Events    Company Information

Home > Remodeler > Product Catalog > Warranty

**Products**



S4SSE

S1S2E

Specialty

Moldings

**WindsorONE Warranty**

**Limited Warranty**:
Windsor Mill guarantees WindsorONE's end and edge-gluing for 10 years and its primer for 5 years. Windsor Mill will replace, without charge, any WindsorONE product that installed according to directions and fails to meet this warranty within that time. Such replacement is the exclusive remedy for breach of warranty, with no consequential or other damages recoverable.

**Warranty Disclaimer**:
Windsor Mill's guarantee is limited to the above Limited Warranty. In Windsor Mill's opinion, its statements about WindsorONE products on this website and in printed literature are believed to be accurate, but do not constitute separate warranties. There are no warranties, expressed or implied, including merchantability, beyond the above Limited Warranty.

WindsorONE Builders

© Copyright 2002 WindsorONE | Contact Us | Privacy Statement | Sitemap | Warranty

EXHIBIT 2



Home > Remodeler > Dealer Locator >

Wood Specie Decay Resistence

From the Wood Handbook by The Forest Products Laboratory.

| Resitant or very resistant | Moderate Resistant | Slightly or nonresistant |
|---|---|---|
| **Domestic** | Baldcypress, young growth | Alder, red |
| Baldcypress, old growth | Douglas-fir | Ashes |
| Catalpa | Larch, western | Aspens |
| Cedar | Pine, longleaf, old growth | Beech |
| Atlantic White | Pine, slash, old growth | Birches |
| Eastern redcedar | Redwood, young growth | Buckeye |
| Incense | Tamarck | Butternut |
| Northern White | | Cottonwood |
| Port-Orford | Pine, eastern white, old growth | Elms |
| Western redcedar | | Basswood |
| Yellow | | Firs, true |
| Cherry, black | | Hackberry |
| Chestnut | | Hemlocks |
| Cypress, Arizona | | Hickories |
| Junipers | | Magnolia |
| Locust, | | Maples |
| Black* | | Pines (other than those listed) |
| Honeylocust | | Spruces |
| Mesquite | | Sweetgum |
| Mulberry, red* | | Sycamore |
| Oaks, white | | Tanoak |
| Osage orange* | | Willows |
| Redwood, old growth | | Yellow-poplar |
| Sassafras | | |
| Walnut, black | | |
| Yew, Pacific* | | |
| **Imported** | | |
| Aftotmosia | Andiroba | Balsa |
| Angelique* | Avodire | Banak |
| Apamate | Benge | Cativo |
| Azobe* | Bubinga | Ceibo |
| Balata* | Ehie | Hura |
| Balau | Ekop | Jelutong |
| Courbaril | Keruing | Limba |
| Determa | Mahogony, Africa | Meranti, light red |
| Goncalo alves* | Meranti, dark red | Meranti, yellow |
| Greenheart* | Mersawa | Meranti, white |
| Ipe (lapacho)* | Sapele | Obeche |
| Iroko | Teak, young growth | Okoume |
| Jarrah* | Tornillo | Parana pine |
| kapur | | Ramin |

INTERNET ARCHIVE
WayBack Machine

5 captures
22 Jan 04 - 10 Nov 06

Go

JAN   MAR
◄ 26
2003   2004

Mahogany, American
Manni
Purpleheart*
Spanish-cedar
Sucupira
Teak, old growth*
Wallaba

*exceptionally high decay resistence

Forest Products Labratory, printed 1999, USA

© Copyright 2002 WindsorONE | Contact Us | Privacy Statement | Sitemap | Warranty

EXHIBIT 3



**Designation: D2559 – 04**

# Standard Specification for
# Adhesives for Structural Laminated Wood Products for Use Under Exterior (Wet Use) Exposure Conditions[1]

This standard is issued under the fixed designation D2559; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

*This standard has been approved for use by agencies of the Department of Defense.*

## 1. Scope*

1.1 This specification covers adhesives suitable for the bonding of wood, including treated wood, into structural laminated wood products for general construction, for marine use, or for other uses where a high-strength, waterproof adhesive bond is required.

1.2 The requirements of the adhesive are based on the performance of the adhesive in laminated wood as measured by:

1.2.1 Resistance to shear by compression loading,

1.2.2 Resistance to delamination during accelerated exposure to wetting and drying, and

1.2.3 Resistance to deformation under static load.

1.3 The values stated in SI units are to be regarded as the standard. The values in parentheses are for information only.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]

D9 Terminology Relating to Wood and Wood-Based Products

D143 Test Methods for Small Clear Specimens of Timber

D905 Test Method for Strength Properties of Adhesive Bonds in Shear by Compression Loading

D907 Terminology of Adhesives

D1165 Nomenclature of Commercial Hardwoods and Softwoods

D1583 Test Method for Hydrogen Ion Concentration of Dry Adhesive Films

D2555 Practice for Establishing Clear Wood Strength Values

D3535 Test Method for Resistance to Creep Under Static Loading for Structural Wood Laminating Adhesives Used Under Exterior Exposure Conditions

D4442 Test Methods for Direct Moisture Content Measurement of Wood and Wood-Base Materials

D4300 Test Methods for Ability of Adhesive Films to Support or Resist the Growth of Fungi

D5266 Practice for Estimating the Percentage of Wood Failure in Adhesive Bonded Joints

E6 Terminology Relating to Methods of Mechanical Testing

E41 Terminology Relating To Conditioning

E691 Practice for Conducting an Interlaboratory Study to Determine the Precision of a Test Method

## 3. Terminology

3.1 *Definitions*—Many terms in this specification are defined in Terminology D907.

3.2 *Definitions of Terms Specific to This Standard:*

3.2.1 *delamination, n*—the separation of layers in a laminate because of failure of the adhesive, either in the adhesive itself or at the interface between the adhesive and the adherend.

3.2.2 *glulam, n*—synonym for *structural-glued-laminated timber.*

NOTE 1—The following ASTM standards may be referred to for other terms used in this specification: Nomenclature D1165, Terminologies D9, E6, and E41.

3.2.3 *laminated wood product, n*—a fabricated wood assembly resulting from the bonding together of two or more laminations, all with the direction of grain essentially parallel, to form a larger piece such as a structural member.

---

[1] This specification is under the jurisdiction of ASTM Committee D14 on Adhesives and is the direct responsibility of Subcommittee D14.30 on Wood Adhesives.

Current edition approved May 1, 2004. Published May 2004. Originally approved in 1966. Last previous edition approved in 2003 as D2559 – 03. DOI: 10.1520/D2559-04.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

***A Summary of Changes section appears at the end of this standard.**

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04

3.2.3.1 *Discussion*—The individual laminations themselves may be made up of two or more pieces both in width and length.

3.2.4 *structural-glued-laminated timber, n*—an engineered stress-rated product of a timber laminating plant comprising assemblies of specially selected and prepared wood laminations securely bonded together with adhesives, with the following characteristics: (*1*) the grain of all laminations is approximately parallel longitudinally; and (*2*) the laminations may be comprised of pieces end-joined to form any length, of pieces placed or glued edge-to-edge to make wider ones or of pieces bent to curved form during gluing. (Synonym: *glulam*) ANSI/AITC A190.1–1992. American National Standard for Wood Products–Structural Glued Laminated Timber (edited to conform with ASTM format).

## 4. Significance and Use

4.1 Structural design based on strength of material principles of the structural components, including the adhesive and the adhesive's potential durability, requires that the suitability for structural wet use exposure be predicted.

4.2 Performance of the adhesive for resistance to shear by compression loading, resistance to delamination during accelerated aging exposure to wetting and drying, and resistance to deformation under load data developed by this test aid in determining if the adhesive is suitable for structural wet use.

## 5. Classification

5.1 The manufacturer shall classify the adhesive as to general type. Typical classifications include: resorcinol, phenol-resorcinol, phenol, melamine, etc.

5.2 The manufacturer may be considered to be the testing facility certifying the adhesive.

## 6. Ordering Information

6.1 The manufacturer will furnish the adhesive in any suitable form agreeable to the purchaser.

## 7. Fillers and Extenders

7.1 If amylaceous or protein fillers and extenders are used, the adhesive must not only pass requirements of this specification, but in addition, possess sufficient antifungal properties to inhibit the growth of selected fungal species when tested in accordance with Test Method D4300. The adhesive manufacturer shall state in his bulletin whether such materials are present.

## 8. Chemical Requirements

8.1 The cured adhesive film shall develop a pH value of not less than 2.5 when tested in accordance with Test Method D1583.

## 9. Physical Requirements

9.1 The adhesive manufacturer shall furnish written instructions stating the general chemical type of adhesive, its storage and mixing procedure, the method of wood preparation, and any other data which is pertinent to the use of the adhesive in the manufacture of laminated wood products.

9.2 The adhesive must pass the tests required by this specification for all limiting conditions recommended in the manufacturer's bulletin. The information furnished by the manufacturer should include each of the following for each species of wood included in his recommendations:

9.2.1 Limits of working life,

9.2.2 Minimum and maximum open and closed assembly times as dictated by temperature, moisture content of the wood, mix age, etc.,

9.2.3 Minimum spread rates for assembly times and use conditions as indicated in 9.2.2,

9.2.4 Minimum cure time and temperature of bondline for complete cure,

9.2.5 Minimum pressure, and

9.2.6 Maximum and minimum allowable moisture content of the wood.

## 10. Selection and Preparation of Wood for Testing of Adhesives

10.1 Test the adhesive on the species of wood to be bonded or for which it is recommended including chemically treated wood (see Note 2). The wood shall have a maximum slope of grain of 1 in 15 on any face or any edge. The wood shall contain no knots larger than 3 mm (⅛ in.) in diameter and shall be free from decay, machining defects (such as chipped grain, dubbed ends, feed roll polish, coarse knife marks, and feed roll compression), and any drying defects such as case hardening, collapse, splits, or checks. Use only flat-grained wood.

NOTE 2—Grouping of species is not permitted.

10.2 *Wood Moisture Content*:

10.2.1 *Ambient Curing Adhesives*—Condition the wood at 23 ± 2°C (73.4 ± 3.6°F) and a relative humidity of 50 to 70 % (preferably 65 %) until a moisture content of 8 to 14 % or, preferably 9 to 12 %, has been attained.

10.2.2 *Hot Press Curing Adhesives*—Condition the wood at 23 ± 2°C (73.4 ± 3.6°F) and a relative humidity of less than 50 % until a moisture content of 3 to 8 % has been attained.

10.3 Freshly surface each lamination before bonding with the adhesive to be tested. Remove at least 0.4 mm (¹⁄₆₄ in.) from each face within 24 h of bonding. The machining tolerances for each lamination used in preparing the test samples shall be no greater than ±0.25 mm (0.01 in.) between laminations and ±0.20 mm (0.008 in.) within laminations.

## 11. Preparation of Laminated Wood Test Members

11.1 *Ambient-Curing Adhesives*:

11.1.1 Prepare six pieces of wood of the same species for each laminated wood member. Each of the six pieces shall have a specific gravity equal to or exceeding the minimum requirement of Table 1. Each piece of wood shall be 19-mm (0.75-in.) thick lumber (see Note 3) at least 140 mm (5½ in.) in width and 1 m (40 in.) long. Orient the direction of the annular growth rings when viewed on the end of the laminations in the laminated wood test member so that they are alternated.

NOTE 3—This thickness would normally come from "nominal 1-in. lumber."

11.1.1.1 If equipment prevents the preparation of laminated wood test members 1 m (40 in.) in length, prepare duplicate

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04

**TABLE 1  Required Shear Strength for Structural Laminated Wood Products**

NOTE 1—For species other than those given, strength values shall be based on 90 % of the value for shear parallel to grain at 12 % moisture content. The use of 90 % of shear parallel to grain at 12 % moisture content takes into account the various subspecies of a particular wood species. The values for shear parallel to grain may be found in Tables 4-3a through 4–4b of the Wood Handbook, Forest Products Society (1999 edition). Base the minimum allowable specific gravity on volume for wood at 12 % moisture content. For species not listed see Note 3. Adjustments for changes in moisture content shall be made in accordance with formula 4–3 (page 4–34) found in the 1999 Wood Handbook.

NOTE 2—It has been documented that bonded shear specimens (Test Method D905 type specimen) on the average provide higher shear strength values than solid wood specimens (Test Methods D143 type specimen). It may appear to be inconsistent to compare shear strength data of bonded specimens to data based on 90 % of the solid wood shear strength found in the Wood Handbook. However, the goal of evaluating shear strength of adhesives in Specification D2559 is to demonstrate the shear strength in a laminated product (tested using Test Method D905 type specimens) meets or exceeds the strength of a solid wood beam when tested by standard procedures for solid wood (Test Methods D143 type specimen).

NOTE 3—For species not found in the 1999 Wood Handbook, values for shear parallel to grain at 12 % moisture content using solid wood are to be obtained on clear, straight-grained specimens following specific ASTM test methods and procedures. These include Test Methods D143 and D2555. Test Methods D143 testing is to be performed on a minimum of 28 shear strength specimens.

| Species | Required Shear Strength, KPa (psi)[A] | | | Minimum Allowable Specific Gravity of Solid Wood Used for Each Lamination[B] |
| | Moisture Content of Wood at Test | | | |
| | 8 % | 12 % | 16 % | |
|---|---|---|---|---|
| Douglas fir | 7 600 (1 110) | 7 000 (1 020) | 6 500    (940) | 0.43 |
| Hemlock, western | 8 900 (1 290) | 8 000 (1 160) | 7 200 (1 050) | 0.41 |
| Larch, western | 9 400 (1 370) | 8 400 (1 220) | 7 600 (1 100) | 0.55 |
| Oak, white | 14 300 (2 080) | 12 400 (1 800) | 11 000 (1 560) | 0.68 |
| Pine, southern | 10 400 (1 510) | 8 600 (1 250) | 7 100 (1 040) | 0.51 |
| Redwood | 6 300    (910) | 5 800    (850) | 5 400    (790) | 0.40 |

[A] Based on 90 % of the shear strength parallel to grain at 12 % moisture content from Table 4–3 of the 1999 Wood Handbook. Use the same shear strength values for a specific species when chemically treated wood is used.
[B] Based on weight when oven dry and volume at 12 % moisture content.

610-mm (24-in.) laminated wood members to obtain at least an equivalent number of test specimens.

11.1.2  Apply the adhesive uniformly to the contacting faces of each lamination in accordance with the manufacturer's instructions.

11.1.3  Place the laminated wood members under pressure for a period of time and at the bondline temperature specified by the manufacturer of the adhesive.

11.1.4  *Conditioning*—Condition the laminated wood members at 23 ± 2°C (73.4 ± 3.6°F) and a relative humidity of 50 to 70 % (preferably 65 %) for the minimum time recommended by the manufacturer for each curing temperature used during the pressure period, and test immediately.

11.2  *Hot-Press Curing Adhesives*:

11.2.1  Prepare six pieces of wood of the same species for each laminated test member. Each of the six pieces shall have a specific gravity equal to or exceeding the minimum requirement of Table 1. Each piece of wood shall be 19 mm (0.75 in.) thick lumber (see Note 4) at least 140 mm (5½ in.) in width and 1 m (40 in.) long as allowed in 11.1.1.1. Orient the direction of the annular growth rings when viewed on the end of the laminations in the laminated wood test member so that they are alternated.

NOTE 4—This thickness would normally come from "nominal 1 in. lumber."

11.2.1.1  If equipment prevents the preparation of laminated wood test members 1 m (40 in.) in length, prepare duplicate 610-mm (24-in.) laminated wood members to obtain an equivalent number of test specimens.

11.2.2  Apply the adhesive uniformly to the contacting faces of each lamination in accordance with the manufacturer's instructions.

11.2.3  Hot press three-layer assemblies at the pressure, press temperature, and to the bondline temperature specified by

the manufacturer of the adhesive. These three-layer assemblies, after conditioning in accordance with 11.1.4, are assembled into six laminated wood test members using a Specification D2559 approved ambient-curing adhesive for the center bondline in accordance with 11.1.3.

11.2.4  *Conditioning*—Condition the laminated wood members at 23 ± 2°C (73.4 ± 3.6°F) and a relative humidity of 50 to 70 % (preferably 65 %) for the minimum time recommended by the manufacturer for each curing temperature used during the pressure period, and test immediately.

## 12.  Number of Tests

12.1  Prepare six laminate wood members for tests, one at each of the limiting conditions listed, but all other factors, as itemized in 9.1 and 9.2, shall be in accordance with the manufacturer's instructions.

12.1.1  Liquid adhesives:

12.1.1.1  Minimum open assembly time with minimum closed assembly time,

12.1.1.2  Maximum open assembly time with maximum closed assembly time, and

12.1.1.3  Minimum open assembly time with maximum closed assembly time.

12.1.2  Film adhesives:

12.1.2.1  Minimum cure time,

12.1.2.2  Minimum cure temperature, and

12.1.2.3  Minimum pressure.

## 13.  Preparation of Test Samples

13.1  Dress the laminated wood members, prepared in accordance with Sections 11 and 12, on the sides to a uniform width of 127 mm (5 in.) at the completion of the conditioning period. Trim 76 mm (3 in.) off one end of each of these members and discard it. Cut the remaining trimmed members

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04

into five sections as shown in Fig. 1. Use the 102–mm (4–in.) sections labeled "A" for conducting tests in resistance to shear by compression loading in accordance with Section 14, and use the 254-mm (10-in.) sections labeled "B" for conducting resistance to delamination tests in accordance with Section 15. Discard the remaining waste trim portion.

13.1.1 If duplicate laminated wood members are made in accordance with 11.1.1.1 or 11.2.1.1 to obtain at least an equivalent number of test specimens, then trim 51 mm (2 in.) off each end. Utilize the remaining trimmed member, 508 mm (20 in.) in length by cutting two 254-mm (10-in.) sections labeled "B" or one 254-mm section "B" and two 102-mm (4-in.) sections "A" as shown in Fig. 1. If two "B" sections are prepared then make separate specimens for shear testing by preparing two-layer laminated wood members and specimens in accordance with Test Method D905. Make and test these specimens from the same species of wood, at exactly the same time, and under the same conditions as required for other test samples in this specification.

## TEST METHODS

## 14. Resistance to Shear by Compression Loading

14.1 *Apparatus*—The testing machine capacity is to be of about 66900 N (15 000 lb) in compression or of sufficient capacity to test the species of wood in use. Equip the testing machine with a shearing tool containing a self-aligning seat to ensure uniform lateral distribution of the load. The machine shall be capable of maintaining a uniform rate of loading such that the load is applied with a continuous motion of the movable head to a maximum rate load not to exceed 13-mm (0.50-in.)/min. The shearing tool shown in Fig. 1 of Test Method D905 has been found satisfactory. Locate the testing machine in an atmosphere such that the moisture content of the test pieces developed in accordance with 11.1.4 is not noticeably altered during testing.

14.2 *Samples*:

14.2.1 Prepare at least six samples for testing in shear by compression loading. When stair-step shear samples are used, cut two from each of the 102–mm (4–in.) sections labeled "A" in Fig. 1. When separate laminated wood samples are made in accordance with 11.1.1.1 or 11.2.1.1 make at least six test

samples and cut at least five test specimens from each as specified by the dimensions of Figs. 2 and 3 of Test Method D905.

14.2.2 The stair-step shear specimens shall conform to the form and dimensions shown in Fig. 2. Take care in preparing the test specimens to assure that the grain direction in the wood is parallel to the direction of loading during test. The loaded surfaces shall be smooth and parallel to each other and perpendicular to the height. When sawing the bonded assembly, exercise care to ensure that the saw cuts to, but not beyond, the adhesive line. Measure the width and height of the specimen at the adhesive line to the nearest 0.25 mm (0.01 in.) to determine the shear area. All requirements above shall apply when individual test specimens are cut from the separately laminated test members of Test Method D905.

14.2.3 Condition the individual test specimens in the conditioning environment described in 11.1.4 and 11.2.4 to a target moisture content of 8, 12, or 16 % for species listed in Table 1. For all other species condition to a target moisture content of 12 %. The allowable variation in the target moisture content before testing is ±1 %. Moisture content is to be determined using Test Methods D4442.

14.3 Test the test specimens cut from the test samples described in 14.2 to failure. Report the shear strength calculated in kilopascals (kPa) (pounds per square inch (psi)) based on the bonded area between two laminations rounded to the nearest 0.0645 mm² (0.01 in.²), for each test specimen together with the estimated percentage wood failure. Practice D5266 has been found useful in estimating the percentage of wood failure in adhesive bonded joints.

14.4 *Requirements*:

14.4.1 The average shear strength for each group of laminated wood members made at one manufacturing condition as specified in Section 12, and tested as described above shall be not less than the values specified in Table 1 at the appropriate moisture content of the wood.

14.4.2 The average wood failure for each group of laminated wood members made at one condition and tested as prescribed in Section 14 shall be not less than 75 % for all species listed in Table 1.

14.5 *Retest*:



**FIG. 1 Laminated Test Beam**

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04



**FIG. 2 Stair-Step Shear Specimen**

14.5.1 If the strength requirements of 14.4 are not satisfied, but the wood failure value is 95 % or more, retest the adhesive.

## 15. Resistance to Delamination During Accelerated Exposure

15.1 *Apparatus*:

15.1.1 An autoclave or similar pressure vessel capable of withstanding at least 550 kPa (80 psi) is required for impregnating the specimens with water. Equip the vessel with a vacuum pump or similar device capable of drawing vacuum of at least 85 kPa (25 in.) Hg (sea level) in the vessel and provide a method for obtaining pressures to 517 kPa (75 psig). Equip the vessel with a steam inlet capable of providing steam at 100°C (212°F) for 1½ h.

15.1.2 An oven capable of maintaining 65.5 ± 2°C (150 ± 3.6°F) with sufficient circulation to remove moisture from the chamber is required for drying the specimens.

15.1.3 Circular fluorescent desk lamp with 5× viewing magnifier in the center of the lamp. Equivalent light sources and magnifier may be substituted for the above.

15.1.4 Machinist's scale graduated in 0.01 and 0.10 divisions.

15.2 *Samples*:

15.2.1 For ambient-curing adhesives prepare six delamination specimens representing three from each 254-mm (10-in.) section labeled "B" in Fig. 1. Cut each 254-mm section into three 76-mm (3-in.) specimens with the 76-mm dimension parallel to the grain direction in the wood. The total length of

bondlines on each end grain face is 635 mm (25 in.). On six specimens this equals 7620 mm (300 in.). Test eighteen specimens (six from each of three laminated wood test members prepared in accordance with Sections 11, 12, and 13 to certify each adhesive on each species of wood to be laminated.

15.2.2 For hot-press curing adhesives prepare eight delamination specimens (four from each 610 mm (24 in.) laminated wood member as allowed in 13.1.1) with dimensions as specified in 15.2.1. In order to achieve the required 7620 mm (300 in.) of test bondlines (as specified in 15.2.1) with hot-pressed laminated wood members, the end grain faces of 7.5 specimens are required. Thus for hot-press curing adhesives, four test bondlines 508 mm (20 in.) on each end grain face of 8 specimens will be examined for a total of 8128 mm (320 in.). Test twenty four specimens (four from each of six laminated wood test members prepared in accordance with Sections 11-13) to certify each adhesive on each species of wood to be laminated.

15.3 *Procedure*:

15.3.1 Weigh and record to the nearest 1 g (0.035 oz) the weight of each test specimen. Place the eighteen 76-mm (3-in.) test specimens in the pressure vessel described in 15.1.1, weigh down, and admit water at a temperature of 18 to 27°C (65 to 80°F) in sufficient quantity so that the specimens are completely submerged throughout the test. Separate the test specimens by stickers, wire screens, or other means in such a manner that all end grain surfaces are freely exposed to the water. Draw a vacuum of at least 85 kPa (25 in.) Hg (sea level) and hold for 5 min. Release the vacuum and apply pressure of 517 ± 14 kPa (75± 2 psi) for 1 h. Repeat the vacuum-pressure cycle with the test specimens remaining submerged, making a two-cycle impregnating period requiring a total of approximately 2½ h (Note 5). Dry the test specimens in the oven described in 15.1.2 at 65.5 ± 2°C (150 ± 3.6°F) for a period of between 21 and 22 h, with sufficient air circulation to lower their weight to within 15 % of the original test specimen weight. During drying, place the test specimens at least 51 mm (2 in.) apart with the end-grain surfaces parallel to the stream of air. This completes the first cycle.

NOTE 5—This should increase the weight of the test specimens by at least 50 %. If the weight is not increased by this amount, continue this cycle until the weight has increased at least 50 %.

15.3.2 Return the specimens to the pressure vessel and admit steam at 100°C (212°F) for 1½ h, with drains open so the wet condensate is removed as formed, after which admit water at 18 to 27°C (65 to 80°F) and apply a pressure of 517 ± 14 kPa (75 ± 2 psi) for 40 min. Dry the specimens in the oven as above. This completes the second cycle.

15.3.3 Repeat the first cycle, making a total test period of 3 days. Record the data as outlined in 15.4.1.

15.4 *Requirements*:

15.4.1 At the end of the final drying period specified in Section 15, visually examine each specimen. Immediately measure, to the nearest 1.27 mm (0.05 in.), the total length of open joints (delamination) on each end-grain surface of each specimen and record in Table 2. Do not record as delamination any failure in the wood due to checking or small isolated knots. Do not record any delamination that is less than 2.54 mm (0.10

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04

**TABLE 2 ASTM D2559 Test Results**

Adhesive: _____

Assembly time: _____

Species: _____

Softwood: ____

Hardwood: ____

| Bond Line | Measured Delamination Length By Specimen Number, in.[A] | | | | | | | | Bond Line Delamination, in.[B] | Bond Line Length, in.[C] | Calculated Delamination, %[D] | Allowable Delamination Softwood, % | Allowable Delamination Hardwood, % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7[E] | 8[E] | | | | | |
| A | | | | | | | | | | 1 | 1.6 | | |
| B | | | | | | | | | | 1 | 1.6 | | |
| C | | | | | | | | | | 1 | 1.6 | | |
| D | | | | | | | | | | 1 | 1.6 | | |
| E | | | | | | | | | | 1 | 1.6 | | |

[A] Sum of both end grain surfaces for each bond line.
[B] Sum of delamination for both end grain surfaces of all specimens for each bond line.
[C] Sum of end grain bond line length of all the specimens.
[D] Bond line delamination (total delamination length in the bond line of all specimens) divided by bond line length (total length of all the bond lines of all specimens) multiplied by 100.
[E] Used only for hot pressing adhesives.

in.) in length and more than 5 mm (0.20 in.) away from any recordable delamination. Record as delamination, any failure where shallow wood failure is noted and no other factors related to the wood, such as grain angle and growth-ring structure, are influencing the delamination. Do not include as delamination, any failure where a significant amount of wood failure is noted and which is influenced by factors such as grain angle or growth-ring structure. Measure and record in Table 2 the total length of end grain bond line for each of the specimens. For total delamination length, add together the recorded delamination for each bond line on the two end-grain surfaces of all the specimens. Report as percent delamination, the total delamination length in each bond line of all the specimens divided by the total length of all the bond lines of all specimens multiplied by 100 and record in Table 2 (see Note 7). The delamination for each manufacturing condition (see Section 12) shall not exceed 1 % for any bond line in the laminated test member for softwoods or 1.6 % for hardwoods. Table 2 is provided to record all measurements and calculate percent delamination.

Note 6—In order to ensure that the core moisture content will exceed the shell moisture content and thus hold the delamination open and visible, the laminated wood test specimens shall be removed from the final drying cycle in the oven, as prescribed in 15.3.1, when the final weight of each specimen is not less than 1.15 nor more than 1.25 times the weight before original treatment.

Note 7—For hot-pressed adhesives the center bondline is evaluated as well as the test bondlines to ensure that the Specification D2559 ambient-curing adhesive performs as expected.

15.5 *Retest*—If the requirements of 15.4.1 are not satisfied in any one laminated wood member, including the center bondline of a hot-pressed laminated test member, then test one additional member. If all the requirements are met in retest, disregard the results of the original test.

**16. Resistance to Deformation Under Static Loading**

16.1 *Procedure*—Test the adhesive in accordance with Test Method D3535 using four multijoint specimens, each loaded to

218.2-kg (480-lb) total load or 1655 kPa (240 psi). Expose two specimens to an environment of 71°C (160°F) at ambient humidity and the other two at 27°C (80°F) at 90 % relative humidity. The exposure period shall be 7 days in both cases.

16.2 *Measurement*—At the end of the exposure period, measure the total length of slippage (deformation) to the nearest 0.127 mm (0.005 in.). Add the total deformation for both test specimens of each variable combination and report in milimetres (inches).

16.3 *Requirement*—The total deformation shall not exceed 3.63 mm (0.139 in.) for the two specimens combined from each variable combination. If either variable combination exceeds the allowable limit, the adhesive has failed.

16.4 *Retest*—If the deformation requirements of 16.3 are not satisfied, but the wood failure is 95 % or more, retest the adhesive.

**17. Report**

17.1 The report shall include the following:

17.1.1 Identification of the adhesive used by class, number, or manufacturer's mark.

17.1.2 Application and bonding conditions used for the specimens.

17.1.3 Wood species evaluated and if not listed in Table 1 the adjusted (90 %) shear strength parallel to grain at 12 % moisture content. Report whether from the Wood Handbook or from testing following guidance in Note 3 in Table 1.

17.1.4 Wood preparation and conditioning including specific gravity and moisture content at time of bonding.

17.1.5 Temperature and relative humidity at time of bonding.

17.1.6 Number of specimens tested.

17.1.7 Number of laminated wood members represented.

17.1.8 Maximum and minimum values obtained. Include the standard deviation or all individual test values, or both, in the report at the option of either the purchaser or the manufacturer of the adhesive.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

D2559 – 04

17.1.9 The average value for each test and the average percentage wood failure for shear and creep resistance.

## 18. Precision and Bias

18.1  A round robin test was conducted on the test method for Resistance to Shear. The precision of shear strength testing has two components: within-laboratory (repeatability) and between-laboratory (reproducibility). The data from the round robin test was analyzed using Practice E691. The precision of the test method is affected by many factors including, but not limited to: (*1*) the wood species, (*2*) grain direction, (*3*) growth ring orientation, (*4*) the quality of the bonded joint, (*5*) precision of the testing machine, and (*6*) the operator.

18.1.1  The round robin was done using southern yellow pine lumber. Table 3 gives the results of the round robin. The results are expressed as precision statistics within a laboratory (repeatability) and between-laboratories (reproducibility). Both standard deviation ($s_r$ and $S_R$) and 95 % repeatability and reproducibility limits (*r* and *R*) were selected as precision statistics. The data generated by this round robin is available.

18.1.2  The 95 % repeatability and reproducibility limits were similar for both shear strength and estimated wood failure. This may indicate that the largest source of variability may be affecting all laboratories such as properties of the wood.

18.2  A round robin was conducted on the test method for Resistance to Delamination using three different species of wood (SPF, SYP, and Hem Fir). The results of the round robin were analyzed using Practice E691.

18.2.1  Table 4 gives the results of the round robin. Both standard deviation ($s_r$ and $s_R$) and 95 % repeatability and reproducibility limits (*r* and *R*) were selected as precision statistics. Since the reproducibility standard deviation (between laboratories) was not much larger than the repeatability standard deviation (within a laboratory), it may indicate that the largest variability was due to a factor which would affect all laboratories such as drying of the specimens or measuring the amount of observable delamination.

18.2.2  The precision of this test method is affected by many factors such as: wood species, grain direction, growth ring orientation, specific gravity of the wood, quality of the bonded joint, oven drying rate, and the operator (including reading of delamination). The data generated by this round robin is available.

18.3  The test methods have no bias because the shear strength, wood failure, and percent delamination are defined by the testing methods.

## 19. Keywords

19.1  adhesive; delamination; glulam; laminated wood; shear strength; structural-glued-laminated timber

### TABLE 3  Shear Strength and Wood Failure Precision

|  | $s_r$ [A] | $s_R$ [B] | $r$ [C] | $R$ [D] |
|---|---|---|---|---|
| Shear Strength | 159.8 | 175.6 | 447.4 | 491.7 |
| Wood Failure | 11.2 | 13.4 | 31.4 | 37.5 |

[A] Standard Deviation Within-Laboratory (repeatability).
[B] Standard Deviation Between-Laboratories (reproducibility).
[C] 95 % Repeatability Limit (within a laboratory).
[D] 95 % Reproducibility Limit (between laboratories).

### TABLE 4  Cyclic Delamination Precision

|  | $s_r$ [A] | $s_R$ [B] | $r$ [C] | $R$ [D] |
|---|---|---|---|---|
| SPF | 3.97 | 4.25 | 11.12 | 11.76 |
| SYP | 1.54 | 2.68 | 4.31 | 7.50 |
| Hem Fir | 5.01 | 9.18 | 14.02 | 25.70 |

[A] Standard Deviation Within-Laboratory (repeatability).
[B] Standard Deviation Between-Laboratories (reproducibility).
[C] 95 % Repeatability Limit (within a laboratory).
[D] 95 % Reproducibility Limit (between laboratories).

## SUMMARY OF CHANGES

Subcommittee D14.30 has identified the location of selected changes to this standard since the last issue (D2559 – 03) that may impact the use of this standard.

*(1)* Addition of referenced Test Methods D4442 in 2.1.

*(2)* Addition of Note 2 to 10.1 that grouping of species is not permitted.

*(3)* Addition of 14.2.3 that requires conditioning shear specimens to a target moisture content prior to testing for Resistance to Shear. For species found in Table 1 the target moisture content is 8, 12, or 16 % and for all other species the target moisture content is 12 %.

*(4)* Revised 15.4.1 on measurement and reporting of delamination. The delamination requirement for each manufacturing condition shall not exceed 1 % for any bond line in the laminated test member for softwoods or 1.6 % for hardwoods.

*(5)* Revised Section 17 to include reporting wood species evaluated and if not listed in Table 1 the adjusted (90 %) shear strength parallel to grain.

*(6)* Revised Table 1 to provide uniformity on required shear strength on listed species by basing on 90 % of shear strength parallel to grain as reported in Table 4–3 of the 1999 Wood Handbook. The revision of Table 1 also provides requirements for determining shear strength of species not found in Table 1 but listed in the 1999 Wood Handbook and requirements for other species not found in the 1999 Wood Handbook.

*(7)* Changes to the standard to allow hot-press curing adhesives as well as ambient-curing adhesives to be evaluated:

(a)  Revised 10.2 (Wood Moisture Content) to include information for both ambient-curing adhesives and hot-press adhesives.

(b)  Revised Section 11 (Preparation of Laminated Wood Test Members) to include information for ambient-curing adhesives in 10.2.1 and for hot-press curing adhesives in 10.2.2. Information specific to hot-press curing adhesives for the preparation of Laminated Test Members is provided in 11.2.1-11.2.4.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

 **D2559 – 04**

(c) Revised Section 15 on Preparation of Specimens for Resistance to Delamination During Accelerated Exposure. Separate sections are provided for ambient-curing adhesives (15.2.1) and hot-press curing adhesives (15.2.2). In order for specimens prepared from hot-press curing adhesives to provide at least the same quantity of test bondline during the delamination test, eight delamination specimens are required compared to six specimens prepared from ambient-curing adhesives.

(d) Revised Table 2 for use with either ambient-curing adhesives or hot-press curing adhesives.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:08 EDT 2015
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

EXHIBIT 4

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 25 of 58



**Designation: D 5572 – 95 (Reappproved 1999)**

# Standard Specification for
# Adhesives Used for Finger Joints in Nonstructural Lumber Products[1]

This standard is issued under the fixed designation D 5572; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This specification establishes performance levels for adhesives to be used in finger joints in nonstructural bonded-lumber products. Such products include, but are not limited to, interior and exterior mouldings, window and door components or parts, and bonded-lumber panels. Adhesives that meet the requirements of the various performance classes are considered capable of providing an adequate bond for use under the conditions described for the class. This specification is to be used to evaluate adhesives as well as the adhesive bonds in the finger joints. See Section 5, Significance and Use, for limitations when using this specification to evaluate industrially manufactured finger joints.

NOTE 1—This specification supersedes the finger-joint portion of the 1990 edition of Specification D 3110.

1.2 The following index is provided as a guide to the test methods in this specification:

| | Section |
|---|---|
| Apparatus | 6 |
| Equipment, Material, and Preparation of Assemblies and Specimens | 7 |
| Conditioning for Factory-Manufactured Assemblies, Laboratory-Made Assemblies, and Test Specimens | 8 |
| Testing in Flexure | 9 |
| Testing in Tension | 10 |
| Exposure Conditions and Treatments | 11 |
| 1. Dry Use Tests: Dry, 3-cycle Soak, Elevated Temperature, and Temperature-Humidity | 11.1 |
| 2. Wet Use Tests: Dry, Boil, Elevated Temperature, and Vacuum-Pressure | 11.2 |

NOTE 2—The conditioning needed for various stages in the preparation of both types of specimens and for the exposure tests are given.

NOTE 3—Specific guidelines for specimen size, exposure conditions, testing, calculation, and reporting are given for flexure specimens in Sections 9 and 11, and for tension specimens in Sections 10 and 11.

1.3 For the definitions of *dry use* and *wet use*, see 3.2.1.1 and 3.2.1.2.

1.4 The values stated in inch-pound units are to be regarded as standard. The SI units given in parentheses are for information only.

1.5 The following precautionary caveat pertains only to the apparatus and test methods portions, Sections 6-11 of this specification: *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*
D 143 Methods of Testing Small Clear Specimens of Timber[2]
D 907 Terminology of Adhesives[3]
D 2016 Methods for Moisture Content of Wood[4]
D 3110 Specification for Adhesives Used in Laminate Joints for Nonstructural Glued Lumber Products[3]
D 4688 Method for Evaluating Structural Adhesives for Fingerjointing Lumber[3]
D 5266 Practice for Estimating the Percentage of Wood Failure in Adhesive Bonding Joints[3]
E 4 Practices for Force Verification of Testing Machines[5]
E 6 Terminology Relating to Methods of Mechanical Testing[5]
E 41 Terminology Relating to Conditioning[6]
E 177 Practice for Use of the Terms Precision and Bias in ASTM Test Methods[7]
E 691 Practice for Conducting an Interlaboratory Study to Determine the Precision of a Test Method[7]

## 3. Terminology

3.1 *Definitions*—Many terms in this specification are defined in Terminology D 907 and Terminology E 41.
3.1.1 *bond, n*—the union of materials by adhesives.
3.1.2 *finger joint, n*—a joint formed by bonding two precut members shaped like fingers. (See Figs. 1 and 2.)
3.2 *Definitions of Terms Specific to This Standard:*
3.2.1 *nonstructural adhesive:*

---

[1] This specification is under the jurisdiction of ASTM Committee D-14 on Adhesives and is the direct responsibility of Subcommittee D14.30 on Wood Adhesives.
Current edition approved Sept. 10, 1995. Published November 1995. Originally published as D 5572 – 94. Last previous edition D 5572 – 94.

[2] *Annual Book of ASTM Standards*, Vol 04.10.
[3] *Annual Book of ASTM Standards*, Vol 15.06.
[4] Discontinued; see *1989 Annual Book of ASTM Standards*, Vol 04.09.
[5] *Annual Book of ASTM Standards*, Vol 03.01.
[6] *Annual Book of ASTM Standards*, Vol 14.04.
[7] *Annual Book of ASTM Standards*, Vol 14.02.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015     1
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 26 of 58



**FIG. 1 Horizontal Joint**



**FIG. 2 Vertical Joint**

### D 5572 – 95 (Reapproved 1999)

3.2.1.1 *dry use nonstructural adhesive, n*—an adhesive capable of producing sufficient strength and durability to make the bonded lumber product serviceable in nonstructural use, under conditions in which the equilibrium moisture content (EMC) of the wood does not exceed 16 %.

3.2.1.2 *wet use nonstructural adhesive, n*—an adhesive capable of producing sufficient strength and durability to make the bonded lumber product serviceable in nonstructural use, under conditions in which the EMC of the wood may be 16 % or greater.

3.3 *Abbreviations:*

3.3.1 *EMC*—equilibrium moisture content.

3.3.2 *MC*—moisture content.

## 4. Test Requirements

4.1 *Adhesives*:

4.1.1 To comply with this specification the test adhesive shall be tested for performance in accordance with Sections 8.1.1-11, and it shall meet the requirements in Table 1 for the selected testing mode and performance classification.

4.1.2 Compliance with this specification shall warrant certification of the adhesive for use on the species of wood that is used for the tests, or for use on a designated group of species when tested and found to be in compliance for any one member of said group of species. The designated species groupings for commonly used domestic and imported woods, as accepted in this specification, are given in Table 2. In the event that the user or supplier of the adhesive, or both, cannot accept the designated groupings in Table 2, either party shall have the option of requesting a test on an individual species. Furthermore, the user and supplier may agree to change any of the wood-failure requirements of Table 1 when applied to tests on Groups 3 and 4 hardwoods from Table 2. For wood-property information on imported woods, see the *Wood Handbook*.[8]

4.1.2.1 The wood-failure requirements listed in Table 1 are given for softwoods and hardwoods. Table 1 shows that the wood-failure requirements for hardwood are 50 % of the requirements for softwoods.

4.2 *Industrially Manufactured Finger Joint*—An industrially manufactured finger joint may be used to evaluate the adhesive, provided its construction meets the requirements set forth in Sections 7-10, and the joint is tested against the requirements in Table 1.

---

[8] U.S. Department of Agriculture Forest Service; Agricultural Handbook, No. 72, *Wood Handbook*, Tables 3 and 4, 1987 edition, pp. 3–11.

**TABLE 1  Minimum Test Requirements**

| Performance Classification and Exposure Conditions[A] | Subsection Number for Exposure Description | Strength, psi (MPa)[C] | Wood Failure[D] | | | | Testing Mode Flexure Modulus of Rupture[C] Minimum psi (MPa)[G] |
|---|---|---|---|---|---|---|---|
| | | | Group Average[E] % | | Individual Minimum[F] % | | |
| | | | Soft Wood | Hard Wood[H] | Soft Wood | Hard Wood[H] | |
| Dry Use: | | | | | | | |
| Cured (dry) | 11.1.1 | 2000 (13.8) | 60 | 30 | 30 | 15 | 2000 (13.8) |
| Three-cycle soak | 11.1.2 | 1000 (6.9) | 30 | 15 | 15 | _I_ | 1000 (6.9) |
| Elevated Temperature ((220°F) (104°C)) | 11.1.3 | 1000 (6.9) | _I_ | _I_ | _I_ | _I_ | _I_ |
| Temperature-Humidity ((140°F (60°C), 16 % EMC)) | 11.1.4 | 750 (5.2) | _I_ | _I_ | _I_ | _I_ | _I_ |
| Wet Use: | | | | | | | |
| Cured (dry) | 11.2.1 | 2000 (13.8) | 60 | 30 | 30 | 15 | 2000 (13.8) |
| Boil | 11.2.2 | 1600 (11.0) | 50 | 25 | 25 | _I_ | 1400 (9.7) |
| Elevated Temperature ((220°F) (104°C)) | 11.2.3 | 1000 (6.9) | _I_ | _I_ | _I_ | _I_ | _I_ |
| Vacuum Pressure | 11.2.4 | 1600 (11.0) | 50 | 25 | 25 | _I_ | 1400 (9.7) |

Columns at top: "Testing Mode Tension[B]" spans the Strength and Wood Failure columns.

[A] Twenty specimens required for each classification and exposure.
[B] Parallel to the grain.
[C] Tension and flexure results may vary with the species. Any acceptable wood should produce joints able to meet these requirements.
[D] The wood-failure requirements are given for softwoods and hardwoods. Groups 3 and 4 hardwoods are listed at 50 % of the softwood value, with no wood-failure requirement if the calculation is 15 % or less. (See 4.1.2.)
[E] For total group of specimens tested.
[F] For 90 % of the specimens tested, they shall meet or exceed these minimum wood-failure values shown. If a zero value is obtained for any of the specimens (the specimen must meet the strength requirement).
[G] For any individual specimen.
[H] See recommended minimum specific gravity in Table 2.
[I] No requirement.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015    2
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 27 of 58

D 5572 – 95 (Reappproved 1999)

**TABLE 2 Bondability Groupings of Commonly Used Domestic and Imported Wood[A]**

| U.S. Hardwoods | U.S. Softwoods | Imported Woods | |
|---|---|---|---|
| | **Group 1—Bond Easily[B]** | | |
| Alder | Cedar, incense | Balsa | Hura |
| Aspen | Fir: | Cativo | Purpleheart |
| Basswood | White | Courbaril | Roble |
| Cottonwood | Grand | Determa[C] | |
| Chestnut, | Noble | | |
| American | | | |
| Magnolia | Pacific | | |
| Willow, black | Pine: | | |
| | Eastern white | | |
| | Western white | | |
| | Redcedar, western | | |
| | Redwood | | |
| | Spruce, Sitka | | |
| | **Group 2—Bond Well[D]** | | |
| Butternut | Douglas-fir | Afrormosia | Meranti (lauan): |
| Elm: | Larch, western[E] | Andiroba | White |
| American | Pine: | Angelique | Light red |
| Rock | Sugar | Avodire | Yellow |
| Hackberry | Ponderosa | Banak | Obeche |
| Maple, soft | Redcedar, eastern | Iroko | Okoume |
| Sweetgum | | Jarrah | Opepe |
| Sycamore | | Limba | Peroba rosa |
| Tupelo | | Mahogany: | Sapele |
| Walnut, black | | African | Spanish-cedar |
| Yellow-poplar | | True | Sucupira |
| | | | Wallaba |
| | **Group 3—Bond Satisfactory[F]** | | |
| Ash, white | Alaska-cedar | Angelin | Meranti (lauan), |
| | | | dark red |
| Beech, American | Port-Orford-cedar | Azobe | Pau marfim |
| Birch: | Pine, southern | Benge | Parana-pine |
| Sweet | | Bubinga | Pine: |
| Yellow | | Karri | Caribbean |
| Cherry | | | Radiata |
| Hickory: | | | Ramin |
| Pecan | | | |
| True | | | |
| Madrone | | | |
| Maple, hard | | | |
| Oak: | | | |
| Red[C] | | | |
| White[C] | | | |
| | **Group 4—Bond With Difficulty[G]** | | |
| Osage-orange | | Balata | Keruing |
| Persimmon | | Balau | Lapacho |
| | | Greenheart | Lignumvitae |
| | | Kaneelhart | Rosewood |
| | | Kapur | Teak |

[A] From *Wood Handbook*[7] Table 9-1 (with the species incense cedar added to Group 1) U.S. Forest Service, USDA, Washington, DC. Although this table is of historical significance, it is recognized that more modern adhesives might lead to different species groupings in regard to difficulty of bonding. The user is referred to 5.2.
[B] Bond very easily with adhesives of a wide range of properties and under a wide range of bonding conditions.
[C] Difficult to bond with phenol-formaldehyde adhesive.
[D] Bond well with a fairly wide range of adhesives under a moderately wide range of bonding conditions.
[E] Wood from butt logs with high extractive content are difficult to bond.
[F] Bond satisfactorily with good-quality adhesives under well-controlled bonding conditions.
[G] Satisfactory results require careful selection of adhesives and very close control of bonding conditions; may require special surface treatment.

## 5. Significance and Use

5.1 Adhesives are classified as dry use or wet use. Each classification includes consideration of short-term in-transit exposure conditions at elevated temperatures up to 220°F (104°C).



*Example Dimensions for Fig. 3 Test Standard Finger Joint:*

| Code | Dimensions, in. (mm)[A] | Degrees |
|---|---|---|
| a | 1.312 (33.32) | ... |
| f | 0.250 (6.25) | ... |
| wt | 0.047 (1.19) | ... |
| wb | 0.092 (2.34) | ... |
| s (Slope) | | 5° |

[A] The dimensions given are for a typical horizontal finger joint and are examples only.

**FIG. 3 Test Standard Finger-Joint Form**

5.2 The initial development of Specification D 3110 was based on finger-joint assemblies made under controlled laboratory conditions. In the development of this revised specification the results obtained with laboratory-made specimens (see 12.1.2) were compared to those obtained with industrially manufactured specimens (see 12.1.1). These finger joints were prepared using previously certified adhesives in cooperation with a manufacturer or equipment supplier who had the necessary finger-joint cutter and assembly equipment. These finger joints may vary in length and length from manufacturer to manufacturer, and this variation could affect the performance of the bonded-finger-joint assembly.[9] (See 12.1, 12.4, and 12.5.) Fig. 3 depicts a sample finger-joint configuration.

5.2.1 When changes are made in the design of the industrially manufactured finger joint, the new design should be compared to a control design that has been used successfully.

5.3 An industrially manufactured finger joint should be evaluated using the requirements for compliance with this specification, in accordance with 4.1. When this specification is used to evaluate specimens made from field-manufactured assemblies, the results may not compare favorably with those run on specimens made from laboratory-made assemblies.

5.4 Test requirements are provided to determine if the adhesive is suitable for dry use or wet use.

5.5 The dry test and exposure conditions and treatments are to evaluate adhesives used in nonstructural finger joints for typical service conditions.

5.5.1 The 220°F (104°C) test, a more severe test, is designed to evaluate the product after exposure to short-term

---

[9] Selbo, M. L., "Effects of Joint Geometry on Tensile Strength of Finger Joints," *Forest Products Journal*, Vol 13, No. 9, September 1963, pp. 390–400.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   3
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 28 of 58

D 5572 – 95 (Reappproved 1999)

elevated-temperature conditions. This test is intended to simulate conditions that might be experienced in transit, further processing, or in-service conditions.

Note 4—These typical service conditions could include stress and time under stress, as well as elevated temperature.

5.6 Procedures are described in sufficient detail to permit duplication in different testing laboratories.

5.6.1 Record any deviations in these procedures on the report forms, Appendix X1, as it may have an impact on the results obtained. Test data are only valid for the length and design used. (See 12.4.)

5.7 To avoid potential problems that would be caused by interrupting the bonding process, the adhesive-performance level should be determined by the finger-joint manufacturer prior to handling and early shipment. Before beginning the full testing process, the testing laboratory should pull a representative sample and check the dry strength first, in order to ensure that the product basically conforms with the performance level certified by the adhesive manufacturer.

## TEST METHODS

### 6. Apparatus

Note 5—The finger-joint specimens to be broken in tension are shorter than those to be broken in flexure. Accommodation must be made in the equipment for handling the larger flexure specimen.

6.1 *Environmental Chamber (For Moist-Heat Aging)*, capable of conditioning specimens at 80 ± 5°F (27 ± 3°C) and 80 ± 5 % relative humidity and capacity for at least 20 specimens well-spaced and supported on racks to allow free air flow.

6.2 *Oven(s)*, with sufficient air circulation to remove moisture from the chamber, and capable of meeting all the following temperature requirements: 105 ± 5°F (41 ± 3°C) (see 11.1.2); 220 and 230 ± 5°F (104 and 110 ± 3°C) (see 11.1.3 and 11.2.3); 150 ± 2°F (65 ± 1°C) (see 11.1.4); and 145 ± 5°F (63 ± 3°C) (see 11.2.2).

6.3 *Tank for Soaking*, capacity to meet the requirements of 11.1.2, so that all of the specimens are at least 2 in. (50.8 mm) below the water level for the duration of the soak cycles.

6.4 *Tank for Boiling*, capacity to meet the requirements of 11.2.2, so that all of the specimens are at least 2 in. (50.8 mm) below the water level for the duration of the boil cycles.

6.5 *Testing Machine for the Flexure Specimen*, capacity of not less than 2200 lbf (1000 kgf) in compression, equipped for one-third span, two-point loading as described in 9.5 and shown in Fig. 4, capable of maintaining a uniform rate of loading such that the load may be applied with a continuous motion of the movable head to maximum at a rate of 0.5 in. (11.7 mm)/min with a permissible variation of ±10 %, and located in an atmosphere such that the moisture content of the specimens developed under the conditions prescribed in Section 11 is not noticeably altered during testing.

6.6 *Testing Machine for the Tension Specimen*, capable of applying a calibrated tensile force, equipped with grips of sufficient length to hold the specimen firmly, preferably a minimum length of 2.5 in. (63.5 mm) by a width of 0.75 in. (19



*Example Dimensions for Fig. 4 Flexure Test Specimen:*

| Code | Dimension, in. (mm)[A] |
|---|---|
| Ls | 12.0 (307.2) |
| b | 0.75 (19.2) |
| d | 0.5 (12.8) |
| e | (see 9.2.1) |

[A] These dimensions are given as examples of a finger-joint assembly. Use the actual measurements of "b" and "d." Code "b" may be the width of a vertical joint, or the thickness of a horizontal joint. Code "e" is the extended dimension of the length of the specimens that falls outside the reaction points.

**FIG. 4 Flexure Test Form and Dimension**

mm), and capacity of both test machine and grips of not less than 2200 lbf (1000 kgf).

Note 6—Depending on the design and adaptability, the same machine with a 2200-lbf (1000-kgf) capacity, described in 6.5 for the flexure testing, can be used for the tension test described in 6.6. (See Practices E 4 and Terminology E 6.)

6.7 *Vacuum-Pressure Vessel*, capable of meeting the requirements of 11.2.4, and capacity to meet the requirement that all of the specimens are at least 2 in. (50.8 mm) below the water level for the duration of the complete vacuum-pressure cycles.

### 7. Preparation of Finger Joint

7.1 *Equipment*—Prepare the finger-joint assemblies in co-operation with a wood-products manufacturer, an equipment manufacturer, or a laboratory having all of the proper equipment.

7.2 *Preparation of Assemblies*:

7.2.1 *Material*—Use lumber that conforms to the requirements: maximum slope of grain of 1 in 14 on any face or edge; EMC of 8 to 12 %, preferably brought to 10 to 12 % MC prior to cutting and bonding; free of knots and decay; free of machining defects such as chipped grain, feed-roll polish, coarse knife marks, and feed-roll compression; free of drying effects, such as case hardening, collapse, or splits or checks. Recommended minimum specific gravities are given in Table 3. Finger joints are to be cut on the day the assemblies are to be made. See 4.1.2 for species compliance rules relative to testing, and Table 2 for information on the bondability of some species of wood.

7.2.2 *Adhesive*—Follow the adhesive manufacturer's instructions for conditions and procedures for preparing and applying the adhesive, as well as for assembling, pressing, and curing the assembly.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015     4
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

D 5572 – 95 (Reapproved 1999)

**TABLE 3 Recommended Minimum Specific Gravities by Species**

| Species | Specific Gravity [A,B] |
|---|---|
| Douglas Fir, East | 0.48 |
| Douglas fir, Interior South | 0.46 |
| Cedar, Alaska | 0.44 |
| Fir, White | 0.39 |
| Hemlock, Western | 0.45 |
| Larch, Western | 0.52 |
| Pine, Lodgepole | 0.41 |
| Pine, Loblolly | 0.51 |
| Pine, Ponderosa | 0.40 |

[A] Values have been taken from Table 4-2, *Wood Handbook*. [7]
[B] Values are averages based on oven-dry weight and volume at 10 to 12 % moisture content.

7.2.3 *Number of Specimens*—For each unique combination of specimen type, mode of testing, and exposure condition, a test group consists of 20 specimens, representing at least four different assemblies with no more than five specimens from each assembly.

## 8. Conditioning

8.1 *Measuring Moisture Content*—There are several stages in this test method where it is necessary to determine the MC as follows: on the lumber before bonding, on the assemblies before cutting into specimens, and on the specimens during several tests when they must be dried to a given MC before testing.

8.1.1 *Factory-Manufactured Assemblies*—When constructing the assemblies, select lumber within the range from 10 to 12 % MC before bonding, (see 7.2.1). Determine the MC by use of an electronic moisture meter, in accordance with Test Method B in Methods D 2016. After bonding the assemblies in the field, control the MC of the specimens throughout the testing process as shown in 8.1.2.1 and 8.1.3 for laboratory-made specimens.

8.1.2 *Laboratory-Made Assemblies*—Select lumber as described in 7.2.1, except determine the MC of the lumber by Test Method A, Oven-Dry; or by Test Method B, Electronic Moisture Meter, of Methods D 2016, when agreement within ±1 % MC with Test Method A has been determined.

8.1.2.1 If needed, condition the assemblies to the original MC,± 1 % MC, by use of an environmental chamber (see 6.1) prior to cutting the specimens.

8.1.3 *Specimen Conditioning During the Testing Process*—The allowable variation in MC at the completion of a drying cycle or before testing dry is ±1 % MC. For example, if the MC of the specimen before exposure is 9 %, the acceptable range for testing is 8 to 10 %. Wood failure is estimated on specimens after they have been conditioned to less than 8 %, except for the dry test described in 11.1.1 and 11.2.1, where the specimens have never been taken from the dry state. Wood failure may be read on these test specimens following the strength testing, with no further conditioning to reduce MC.

## 9. Testing in Flexure

9.1 *Conditioning*—Follow instructions in Section 8.

9.2 *Preparation of Test Specimen*:

9.2.1 *Form and Dimension*—From a finger-jointed assembly (see 7.2), cut the flexure-test specimens with sufficient length for the joint to be centered at midspan as in Fig. 4, and

with a distance between reaction points of 24 multiplied by the depth, *d*. Allow at least 1 in. (25 mm) at both ends of the specimen outside the reaction points. On each edge of the specimen, feather out the finger at the midpoint of the joint, adjusting the width of the specimen accordingly. (See Fig. 5.)

NOTE 7—In this application, "to feather" means to remove any portion extending beyond the normal surface of the outer finger so that the stress riser (butt joint effect) is not present on the surface. See Fig. 5.

9.3 *Exposure Conditions*—Subject the specimens to the tests for the selected wet-use or dry-use classification, or both, in accordance with the applicable conditions and treatments given in Section 11. Consult Table 1 for the tests required for each testing mode and performance classification.

9.4 *Testing Machine*— See 6.5.

9.5 *Testing Procedure*— Apply the load with a continuous motion of the movable head at a rate of 0.5 in. (12.7 mm)/min (±10 %), testing the specimens by one-third span, two-point loading with the load applied perpendicular to the face showing the fingers, as shown in Fig. 4.

9.6 *Calculation*—Calculate the modulus of rupture in pounds-force per square inch or kilopascals as follows:

$$R = Pl/bd^2 \qquad (1)$$

where:
$R$ = modulus of rupture, psi (MPa),
$P$ = maximum load, lbf (N),
$l$ = length of span (24d), in. (mm),
$b$ = breadth of specimen, in. (mm), and
$d$ = depth of specimen, in. (mm).

9.7 *Report*—Report the modulus of rupture values on the form shown in Fig. X1.1for dry use and wet use. Also, report the wood species used for testing, indicate whether it is classified as soft wood or hard wood, and report the slope of the finger in degrees. Report the measurements for $b$ and $d$, to the nearest 0.01 in. (0.25 mm) for each specimen. Fig. X1.1 also includes spaces for the recording of several items of bonding information that, although not required for test reporting, have been found useful in product quality control.

## 10. Testing in Tension

10.1 *Conditioning*— Follow the instructions in Section 8.

10.2 *Preparation of Test Specimen*:



**FIG. 5 Feathered Finger Joint**

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015  5
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

D 5572 – 95 (Reapproved 1999)

10.2.1 *Form and Dimensions*—From a finger-jointed assembly, cut the tension test specimens, with each measuring 0.25 by 0.75 ± 0.01 in. (6.35 by 19.05 ± 0.25 mm), with a recommended length of 10 in. (25.4 cm). Trim the outer fingers of the specimen as described in Note 7 and as shown in Fig. 5, a process known in this specification as "feathering." (See 9.2.1 and Note 7.)

Note 8—Fig. 6 illustrates a sample finger-joint configuration. Ten inches (25.4 cm) is the preferred length, but shorter lengths may be necessary to accommodate certain testing machines. (See 5.5.1.)

10.3 *Exposure Conditions*—Follow the instructions in Section 11. See Table 1 for the tests required for each testing mode and performance classification.

10.4 *Testing Machine*— See 6.6.

10.5 *Testing*—Apply the load at a rate of 0.5 in. (12.7 mm)/min.

10.6 *Calculation*—Calculate the ultimate tensile stress in pounds-force per square inch or megapascals based on tensile breaking load and the cross-sectional area at the finger joint.

10.7 *Report*—Report the tensile-stress values together with the estimated percentages of wood failure on the form shown in X1.2 for dry use or X1.3 for wet use. Indicate whether the assemblies were field-manufactured or laboratory-made. Also, report the wood species and indicate whether it is classified as soft wood or hard wood. Report the slope of the finger in degrees and the dimensions to the nearest 0.01 in. (0.25 mm) for each specimen: length of the finger (f), width of the finger at the tip (wt), and width of the finger at the base (wb). See Fig. 3.

10.7.1 Estimate the wood failure on the finger joints by eye to the nearest 5 %. In addition, the mode and location of failure may be noted, that is, as wood failure away from the joint, through the tips, or following the fingers. See Appendixes X6 and X7 for guidelines on reading wood failure.

## 11. Exposure Conditions and Treatments

Note 9—Due to the number of specimens to be tested and the type of tests that must be run, there may not be sufficient time to run all the specimens at one time in the time allotted. So that the time schedule may be followed, before running the tests in 11.1.3, 11.2.2, 11.2.3, and 11.2.4, determine whether 1 h is enough time to test 20 specimens. If not, divide the specimens into smaller groups before running the exposure tests.

11.1 *Dry Use*—The exposure conditions and treatments used with each testing mode to meet the dry-use classification requirements are listed in Table 1. See 8.1.3 for information on allowable MC when testing the specimens. See 10.7.1 for

instructions on reading wood failure. Details of the test methods are given as follows:

11.1.1 *Dry Test*—Following the prescribed curing period for the adhesive being tested, condition or dry one group of the specimens (see 7.2.2) to within the allowable range of ±1 % MC of the original MC (see 8.1.3), and test in accordance with the instructions in 9.5 or 10.5.

11.1.2 *Soak Test (Three Cycle)*—Place one group of the specimens (see 7.2.2) in the soak tank, separated by stickers, wire screens, or other means, in such a manner that all surfaces are freely exposed to the water. Weight down the specimens in water at 65 to 80°F (19 to 27°C) so that all specimens are at least 2 in. (50.8 mm) below the surface of the water. Keep the specimens immersed for a period of 4 h, followed by drying at a temperature of 105 ± 5°F (41 ± 3°C) for a period of 19 h, with sufficient air circulation to reduce the moisture content of specimens to within ±1 % MC of the original MC as described in 8.1.3. Repeat this procedure twice more for a total of three cycles. Following the third cycle, conduct the tests in the dry condition at 75 ± 5°F (24 ± 3°C). If needed before testing and reading wood failure, condition or dry to less than 8 % MC, in an environmental chamber. (See 8.1.3.) Use of an electronic moisture meter, as described in 8.1.1, is acceptable to determine MC.

11.1.3 *Elevated Temperature Test*—Use either of the following test methods:

11.1.3.1 *Test Method Number One*—Place one group of specimens (see 7.2.3) in an oven at 220 ± 5°F (104 ± 3°C) and hold for 6 h. Remove the specimens individually and immediately wrap each in two layers of PVDC wrap.[10] Place wrapped specimens in a single layer in an oven at 230 ± 5°F (110 ± 3°C), and hold for a minimum of 12 min and maximum of 22 min. Remove them from the oven one specimen at a time, and test within 30 s, without removing the PVDC wrap. Conduct the test in a room with an ambient temperature of 75 ± 5°F (24 ± 3°C).

Note 10—The exposure of the unwrapped specimens for 6 h at 220 ± 5°F (104 ± 3°C), is for the purpose of simulating an elevated temperature environment that could be encountered during transportation. Polyvinylidene chloride wrap slows the cooling rate while testing. This method has been corroborated by a laboratory that participated in the round robins.

Note 11—Using this procedure, the temperature of a specimen 15 s after removal from the oven will be approximately 220°F (104°C). The

[10] PVDC(polyvinylidene chloride) wrap is the generic designation for the tightly adhering, flexible films commonly used for covering food containers in the home.



*Example Dimensions for Fig. 6:*

| (L) | 10 in. (254.0 mm) [A,B] |
|---|---|
| (H) | 0.75 in. (19.05 mm) |
| (W) | 0.25 in. (6.35 mm) |

[A] The dimensions are given as examples only.
[B] The recommended length is 10 in. Some testing machines cannot accommodate this length. See Note 7.

**FIG. 6 Tension Test Multifinger Form and Dimension**

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015     6
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO  Document 50  Filed 09/14/15  Page 31 of 58

**D 5572 – 95 (Reapproved 1999)**

cool-down rate was based on actual tests of specimens.

11.1.3.2 *Test Method Number Two*—Test the specimens for the effect of elevated temperature by using a heated chamber that is capable of heating the specimens to 220 ± 5°F (104 ± 3°C) for 6 h, and also enclosing the testing machine for testing immediately following the exposure period. (See 6.2.)

11.1.4 *Temperature-Humidity Test*—Condition one group of specimens (see 7.2.3) to equilibrium at 80 ± 5°F (27 ± 3°C) and 80 ± 5 % relative humidity (equivalent to 16 % EMC).[11] Wrap each specimen in two layers of PVDC wrap and place in a single layer in oven at 150 ± 2°F (65 ± 1°C) for 12 to 20 min. In a room with an ambient temperature of 75 ± 2°F (24 ± 1°C), remove specimens one at a time and test within 30 s without removing the PVDC wrap.

11.2 *Wet Use*—The exposure conditions and treatments used with each testing mode to meet the wet-use classification requirements are listed in Table 1. See 8.1.3 for information on allowable MC when testing the specimens. See 10.7.1 for instructions on reading wood failure. Details of the test methods are given as follows:

11.2.1 *Dry Test*—Follow the instructions in 11.1.1.

11.2.2 *Boil Test*—Place one group of specimens (see 7.2.3) in a tank of boiling water, separated by stickers, wire screens, or other means, in such a manner that all surfaces are freely exposed to the water. Weight down the specimens so they remain immersed at least 2 in. (50.8 mm) during the boil cycle. Boil for 4 h. Dry for 20 h at 145 ± 5°F (63 ± 3°C) with sufficient air circulation to lower the MC of the specimens to the original MC, within an allowable variation of ±1 % MC. (See 8.1.3.) Determine the MC by removing a specimen at 18, 19, and 20 h and testing with a moisture meter until the MC reading is in the desired range, or predetermine the time required to reach the desired MC by running samples. Repeat the 4-h boil cycle. Then remove the specimens and cool in running water at 65 to 80°F (18 to 27°C) for 1 h. Remove the specimens from the water and place them in a plastic bag to keep them wet. Test while wet within 1 h.

11.2.2.1 For the specimens broken in tension, dry to less than 8 % MC before estimating the percentage of wood failure. Use of an electronic moisture meter, as described in 8.1.1, is acceptable to determine MC.

11.2.3 *Elevated-Temperature Test*—Follow the instructions in 11.1.3.

11.2.4 *Vacuum-Pressure Test*—Place one group of specimens (see 7.2.3) in a pressure vessel, separated by stickers, wire screens, or other means in such a manner that all surfaces can be freely exposed to the water. Weight down the specimens, and fill the vessel with water at 65 to 80°F (18 to 27°C) so that all specimens are immersed at least 2 in. (51 mm). Draw and maintain a vacuum of at least 25 in. Hg (84.4 kPa) for 30 min. Release the vacuum, and follow immediately with pressure of 75 ± 2 psi (517 ± 14 kPa) for 30 min. Remove the specimens from the vessel and place in a plastic bag to keep them wet. Test while wet within 1 h. (See Note 9.) Dry to less than 8 % MC as described in 8.1.3 before reading wood failure. Use of an electronic moisture meter, as described in 8.1.1, is acceptable to determine MC.

## 12. Precision and Bias

12.1 The precision of these tests on finger joints tested in tension was determine by a series of round-robin tests. The data were analyzed using the procedure in accordance with Practice E 691. Factors carefully controlled were: wood species, finger-joint configuration, cutting-tool condition, adhesive, and bonding condition. The data generated by these round robins are available.[12]

12.1.1 A round-robin test to determine repeatability and reproducibility was run on field-manufactured specimens. This test was compared to two earlier round-robin tests where the specimens were made under controlled laboratory conditions. The repeatability and reproducibility of the tensile-strength data on the field-manufactured specimens were an improvement over that obtained on the laboratory-made specimens. The repeatability and reproducibility of the wood-failure data on the field-manufactured specimens generally showed more variability when compared to that of laboratory-made specimens.[12]

12.1.2 Table 4 gives the results of the study on laboratory-made specimens, expressed as the coefficient of variation ($CV \%_r$) within a laboratory (repeatability), and ($CV \%_R$) between laboratories (reproducibility). The research report[12] gives the maximum and minimum tensile strengths and wood failures for all tests run for Round Robins 1 and 2 on laboratory-made specimens. The research report[12] compares the repeatability and reproducibility of the data on the field-manufactured specimens to that of the laboratory-made specimens.

12.2 Practice E 691 allows reporting of results in a number of different ways. Coefficient of variation (CV) was chosen in this instance because the mean varied so much that comparing standard deviations did not give a clear picture. Using CV's illustrates the larger standard deviation in comparison to the means.

12.3 An explanation of the preferred indexes of precision for ASTM test methods is given in 28.1 and 28.2 of Practice E 177. These paragraphs include the calculations for the

**TABLE 4 Tensile-Strength and Wood-Failure Precision**

| | Tensile Strength | | Wood Failure | |
|---|---|---|---|---|
| | $CV \%_r^A$ | $CV \%_R^B$ | $CV \%_r^A$ | $CV \%_R^B$ |
| Dry | 72.6 | 74.5 | 31.5 | 32.8 |
| Boil | 42.0 | 66.1 | 129.5 | 155.5 |
| Vacuum-Pressure | 60.9 | 68.3 | 79.9 | 86.6 |
| 165°F (74°C) | 52.9 | 63.2 | 120.8 | 137.3 |
| 220°F (104°C) | 49.7 | 62.7 | 188.1 | 220.8 |

[A] Repeatability, coefficient of variation in percent (within a laboratory).
[B] Reproducibility, coefficient of variation in percent (between laboratories).

---

[11] Forest Products Laboratories, "Wood Handbook: Wood as an Engineering Material," *Agriculture Handbook No. 72*. Washington, DC: U.S.D.A.; Rev. 1987. Tables 3 and 4, pp. 3–11, "Moisture Content of Wood in Equilibrium with Stated Dry Bulb Temperature and Relative Humidity."

[12] Supporting data are available from ASTM Headquarters. Request RR:D14-1005.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015  7
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 32 of 58

D 5572 – 95 (Reapproved 1999)

coefficients of variation for both $CV\%_r$ and $CV\%_R$. $CV\%_r$ and $CV\%_R$ are larger than the coefficient of variation ($s/n$), calculated as shown in Note 12. (See Appendix X2 for the pertinent excerpts from Practice E 177.)

NOTE 12—The coefficient of variation that has been historically used by the industry is calculated by the formula:

$$CV = s/n \qquad (2)$$

where:
$CV$ = coefficient of variation,
$s$ = standard deviation, and
$n$ = mean.

12.3.1 In this specification, Committee D-14 has chosen to use the preferred indexes of precision for ASTM test methods, as given in Practice E 177.

12.4 For the laboratory-made specimen (see Appendix X2), when finger lengths were 0.3 and 1.0 in. (7.6 and 25.4 mm), length did not appear to influence the precision of either tensile strength or wood failure. The estimation of wood failure by the various participating laboratories was determined not to be a source of variation.

12.5 On the laboratory-made specimens, the main source of imprecision was within, rather than between, the individual laboratories. This indicates that the primary sources of variability may be attributed to specimen factors such as wood density, wood strength, wood-grain slope, and testing conditions.

12.6 To determine a base precision, samples of clear wood were prepared and broken in accordance with Methods D 143 and analyzed in accordance with Practice E 691. Table 5 gives the results of this study.

12.6.1 The repeatability within laboratories obtained from clear-wood specimens is consistent with that of the laboratory-made finger-joint specimens. This suggests that the results from the finger-joint round-robin test show the repeatability that is achievable within a laboratory.

12.6.2 The reproducibility between laboratories obtained from the clear-wood specimens as compared with laboratory-made finger-joint specimens, illustrates that this may be the best reproducibility achievable on bonded specimens.

12.7 No precision has been determined for finger joints broken in flexure.

12.8 These test methods have no measure of bias since the tensile strength and wood failure are defined by the testing methods.

## 13. Keywords

13.1 adhesive; bonded; dry use; finger joint; flexure; non-structural; tension; wet use

**TABLE 5 Clear-Wood Tensile Precision**

| | |
|---|---|
| Tensile Strength, psi | 14 500 |
| $CV\%_r{}^A$ | 46.2 |
| $CV\%_R{}^B$ | 61.6 |

[A] Repeatability, coefficient of variation in percent (within a laboratory).
[B] Reproducibility, coefficient of variation in percent (between laboratories).

## APPENDIXES

### (Nonmandatory Information)

### X1. REPORT FORMS

X1.1 The following report forms in Fig. X1.1, Fig. X1.2, and Fig. X1.4 are used to record test results and to provide an easy reference to determine whether the specimens prepared with the test adhesive pass the requirements of this specification. A supplementary page is provided in Fig. X1.6 for recording information needed for interpretation of the results.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015    8
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.



**D 5572 – 95 (Reappproved 1999)**

```
Report No.
Adhesive Manufacturer _____
Testing Facility _____
Laboratory No. _____
```

| | MODULUS OF RUPTURE, DRY USE | | MODULUS OF RUPTURE, WET USE | | |
|---|---|---|---|---|---|
| Type Test | Dry 11.1.1 | 3-Cycle Soak 11.1.2 | Dry 11.2.1 | Boil 11.2.2 | Vacuum Pressure 11.2.4 |
| | Strength Total Group | Strength Total Group | Strength Total Group | Strength Total Group | Strength Total Group |
| | psi (MPa) | psi (MPa) | psi (MPa) | psi (MPa) | psi (MPa) |
| 1 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 2 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 3 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 4 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 5 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 6 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 7 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 8 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 9 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 10 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 11 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 12 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 13 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 14 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 15 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 16 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 17 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 18 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 19 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| 20 | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| Avg | ----- ----- | ----- ----- | ----- ----- | ----- ----- | ----- ----- |
| A Avg | 2000 (13.8) | 1000 (6.9) | 2000 (13.8) | 1400 (9.7) | 1400 (9.7) |
| B WF% | XXX | XXX | XXX | XXX | XXX |
| Passed | _____ | _____ | _____ | _____ | _____ |
| Meets Dry Use Requirement Yes___ No___ | | | Meets Wet Use Requirement Yes___ No___ | | |

```
A Required minimum average strength for       Test Specimens*
    total group of specimens in psi (MPa).     MOR __in(b) x __in(d)
                                                   x __in(Ls)
B No wood failure requirement.                  Fingers (f) __in
                                                Width, tip (wt)__in
                                                Width, base(wb)__in
                                               *Slope (s) ____
                                               --------------------
                                                  *See FIG. 3.
```

**FIG. X1.1 Modulus of Rupture, Dry Use and Wet Use**

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015    9
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 34 of 58

### D 5572 – 95 (Reappproved 1999)

Report No. _____
Adhesive Manufacturer_____
Testing Facility_____
Laboratory No._____

| Type Test | Dry 11.1.1 | | | 3-Cycle Soak 11.1.2 | | |
|---|---|---|---|---|---|---|
| | Strength Total Group | (A) Wood Failure | | Strength Total Group | (A) Wood Failure | |
| | | Soft Wood | Hard Wood | | Soft Wood | Hard Wood |
| | | Total Group | Total Group | | Total Group | Total Group |
| | psi or (MPa) | % | % | psi or (MPa) | % | % |
| 1 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 2 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 3 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 4 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 5 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 6 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 7 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 8 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 9 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 10 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 11 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 12 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 13 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 14 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 15 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 16 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 17 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 18 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 19 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| 20 | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| Avg | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| B Avg | 2000 (13.8) | XXX | XXX | 1000 (6.9) | XXX | XXX |
| C WF% Total | XXX | 60 | 30 | XXX | 30 | 15 |
| D WF% Min. | XXX | 30 | 15 | XXX | 15 | E |
| Passed | _____ | _____ | _____ | _____ | _____ | _____ |
| Meets Dry Use Requirement | Yes_____ | No_____ | | | | |

A Place a check alongside the minimum wood failure value.
B Required minimum average strength for total group of specimens in psi(MPa).
C Required minimum average % wood failure for total group of specimens.
D Required minimum % wood failure for individual specimen. (See Table 1, Footnote F.)
E No wood failure requirement.

FIG. X1.2 Report Form for Finger Joints—Tension, Dry Use (Part 1)

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   10
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 35 of 58

**D 5572 – 95 (Reappproved 1999)**

Report No. _____
Adhesive Manufacturer_____
Testing Facility_____
Laboratory No._____

| Type Test | 220°F(104°C) 11.1.3 | | | 140°F (60°C) 11.1.4 | | |
|---|---|---|---|---|---|---|
| | Strength Total Group | (A) Wood Failure | | Strength Total Group | (A) Wood Failure | |
| | | Soft Wood | Hard Wood | | Soft Wood | Hard Wood |
| | | Total Group | Total Group | | Total Group | Total Group |
| | psi or (MPa) | % | % | psi or (MPa) | % | % |
| 1 | ------- | ------- | ------- | --------- | ------- | ------- |
| 2 | ------- | ------- | ------- | --------- | ------- | ------- |
| 3 | ------- | ------- | ------- | --------- | ------- | ------- |
| 4 | ------- | ------- | ------- | --------- | ------- | ------- |
| 5 | ------- | ------- | ------- | --------- | ------- | ------- |
| 6 | ------- | ------- | ------- | --------- | ------- | ------- |
| 7 | ------- | ------- | ------- | --------- | ------- | ------- |
| 8 | ------- | ------- | ------- | --------- | ------- | ------- |
| 9 | ------- | ------- | ------- | --------- | ------- | ------- |
| 10 | ------- | ------- | ------- | --------- | ------- | ------- |
| 11 | ------- | ------- | ------- | --------- | ------- | ------- |
| 12 | ------- | ------- | ------- | --------- | ------- | ------- |
| 13 | ------- | ------- | ------- | --------- | ------- | ------- |
| 14 | ------- | ------- | ------- | --------- | ------- | ------- |
| 15 | ------- | ------- | ------- | --------- | ------- | ------- |
| 16 | ------- | ------- | ------- | --------- | ------- | ------- |
| 17 | ------- | ------- | ------- | --------- | ------- | ------- |
| 18 | ------- | ------- | ------- | --------- | ------- | ------- |
| 19 | ------- | ------- | ------- | --------- | ------- | ------- |
| 20 | ------- | ------- | ------- | --------- | ------- | ------- |
| Avg | ------- | ------- | ------- | --------- | ------- | ------- |
| B Avg | 1000 6.9) | XXX | XXX | 750 (5.2) | XXX | XXX |
| C WF% Total | XXX | E | E | XXX | E | E |
| D WF% Min. Passed | XXX | E | E | XXX | E | E |

Meets Dry Use Requirement    Yes_____    No_____

A Place a check alongside the minimum wood failure value.
B Required minimum average strength for total group of specimens in psi(MPa).
C Required minimum average % wood failure for total group of specimens.
D Required minimum % wood failure for individual specimen. (See Table 1, Footnote F.)
E No wood failure requirement.

FIG. X1.2 Report Form for Finger Joints—Tension, Dry Use (Part 2) *(continued)*

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015    11
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 36 of 58

### D 5572 – 95 (Reappproved 1999)

```
                    Report No._____
        Adhesive Manufacturer_____
        Testing Facility_____
        Laboratory No._____
```

| Type | Dry | | | Boil | | |
|------|-----|---|---|------|---|---|
| Test | 11.2.1 | | | 11.2.2 | | |
| | Strength | (A) Wood Failure % | | Strength | (A) Wood Failure % | |
| | Total Group | Soft Wood | Hard Wood | Total Group | Soft Wood | Hard Wood |
| | psi or (MPa) | Total Group % | Total Group % | psi or (MPa) | Total Group % | Total Group % |
| 1 | ------- | ------ | ------ | ------- | ------ | ------ |
| 2 | ------- | ------ | ------ | ------- | ------ | ------ |
| 3 | ------- | ------ | ------ | ------- | ------ | ------ |
| 4 | ------- | ------ | ------ | ------- | ------ | ------ |
| 5 | ------- | ------ | ------ | ------- | ------ | ------ |
| 6 | ------- | ------ | ------ | ------- | ------ | ------ |
| 7 | ------- | ------ | ------ | ------- | ------ | ------ |
| 8 | ------- | ------ | ------ | ------- | ------ | ------ |
| 9 | ------- | ------ | ------ | ------- | ------ | ------ |
| 10 | ------- | ------ | ------ | ------- | ------ | ------ |
| 11 | ------- | ------ | ------ | ------- | ------ | ------ |
| 12 | ------- | ------ | ------ | ------- | ------ | ------ |
| 13 | ------- | ------ | ------ | ------- | ------ | ------ |
| 14 | ------- | ------ | ------ | ------- | ------ | ------ |
| 15 | ------- | ------ | ------ | ------- | ------ | ------ |
| 16 | ------- | ------ | ------ | ------- | ------ | ------ |
| 17 | ------- | ------ | ------ | ------- | ------ | ------ |
| 18 | ------- | ------ | ------ | ------- | ------ | ------ |
| 19 | ------- | ------ | ------ | ------- | ------ | ------ |
| 20 | ------- | ------ | ------ | ------- | ------ | ------ |
| Avg | ------- | ------ | ------ | ------- | ------ | ------ |
| B Avg | 2000 (13.8) | XXX | XXX | 1600 (11.0) | XXX | XXX |
| C WF% Total | XXX | 60 | 30 | XXX | 50 | 25 |
| D WF% Min. | XXX | 30 | 15 | XXX | 25 | E |
| Passed | _____ | _____ | _____ | _____ | _____ | _____ |

```
Meets Wet Use Requirement   Yes____   No____
```

A Place a check alongside the minimum wood failure value.
B Required minimum average strength for total group of specimens in psi(MPa).
C Required minimum average % wood failure for total group of specimens.
D Required minimum % wood failure for individual specimen. (See Table 1, Footnote F.)
E No wood failure requirement.

**FIG. X1.4 Report Form for Finger Joints—Tension, Wet Use (Part 1)**

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   12
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 37 of 58

### D 5572 – 95 (Reappproved 1999)

```
                    Report No. _____
        Adhesive Manufacturer_____
        Testing Facility_____
        Laboratory No._____
```

| Type | 220°F (104°C) | | | Vacuum Pressure | | |
|------|------|------|------|------|------|------|
| Test | 11.2.3 | | | 11.2.4 | | |
| | Strength | (A) Wood Failure % | | Strength | (A) Wood Failure % | |
| | Total Group | Soft Wood | Hard Wood | Total Group | Soft Wood | Hard Wood |
| | psi or (MPa) | Total Group % | Total Group % | psi or (MPa) | Total Group % | Total Group % |
| 1 | ———— | ———— | ———— | ———— | ———— | ———— |
| 2 | ———— | ———— | ———— | ———— | ———— | ———— |
| 3 | ———— | ———— | ———— | ———— | ———— | ———— |
| 4 | ———— | ———— | ———— | ———— | ———— | ———— |
| 5 | ———— | ———— | ———— | ———— | ———— | ———— |
| 6 | ———— | ———— | ———— | ———— | ———— | ———— |
| 7 | ———— | ———— | ———— | ———— | ———— | ———— |
| 8 | ———— | ———— | ———— | ———— | ———— | ———— |
| 9 | ———— | ———— | ———— | ———— | ———— | ———— |
| 10 | ———— | ———— | ———— | ———— | ———— | ———— |
| 11 | ———— | ———— | ———— | ———— | ———— | ———— |
| 12 | ———— | ———— | ———— | ———— | ———— | ———— |
| 13 | ———— | ———— | ———— | ———— | ———— | ———— |
| 14 | ———— | ———— | ———— | ———— | ———— | ———— |
| 15 | ———— | ———— | ———— | ———— | ———— | ———— |
| 16 | ———— | ———— | ———— | ———— | ———— | ———— |
| 17 | ———— | ———— | ———— | ———— | ———— | ———— |
| 18 | ———— | ———— | ———— | ———— | ———— | ———— |
| 19 | ———— | ———— | ———— | ———— | ———— | ———— |
| 20 | ———— | ———— | ———— | ———— | ———— | ———— |
| Avg | ———— | ———— | ———— | ———— | ———— | ———— |
| B Avg | 1000 (6.9) | XXX | XXX | 1600 (11.0) | XXX | XXX |
| C WF% Total | XXX | E | E | XXX | 50 | 25 |
| D WF% Min. Passed | XXX | E | E | XXX | 25 | E |
| Meets Wet Use Requirement   Yes____   No____ | | | | | | |

```
A Place a check alongside the minimum wood failure value.
B Required minimum average strength for total group of
    specimens in psi(MPa).
C Required minimum average % wood failure for total group
    of specimens.
D Required minimum % wood failure for individual specimen.
    (See Table 1, Footnote F.)
E No wood failure requirement.
```

**FIG. X1.4 Report Form for Finger Joints—Tension, Wet Use (Part 2)** *(continued)*

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   13
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 38 of 58

**D 5572 – 95 (Reappproved 1999)**

```
--------------------------------------------------------------

Report No. _____

Date _____

Adhesive Manufacturer _____

Testing Facility _____

Laboratory No. _____

Species Used _____

Hard Wood _____          Check one

Soft Wood _____          Check one

Adhesive Used _____

Field Mfg. _____          Check one

Laboratory Made _____          Check one

Date Bonded _____

Date Received _____

Tested by _____

Adhesive mix, spread, pressing conditions and comments -----

          _____

          _____

          _____


Test Specimens*
---------------
Fingers (f) _____ in (_____ mm)

Width at Tip (wt) _____in (_____ mm)

Width at Base (wb) _____in (_____ mm)

*Slope (s) _____
---------------------------------------------
```

\* See FIG 2.

**FIG. X1.6 Supplementary Information for Use With Fig. X1.2 and Fig. X1.4**

## X2.   EXCERPTS FROM PRACTICE E 177

X2.1   Several terms that are used in this specification are defined in Practice E 177 and are shown as follows for reference. The subsection number from Practice E 177 is shown following the definition.

X2.1.1   *bias, n*—a generic concept related to a consistent or systematic difference between a set of test results from the process and an accepted reference value of the property being measured. (See X1.1.3 of Practice E 177.)

X2.1.2   *precision, n*— a generic concept related to the closeness of agreement between test results obtained under prescribed like conditions from the measurement process being evaluated. (See X1.1.5 of Practice E 177.)

X2.1.3   *repeatability, n*—a general term for a measure of precision applicable to the variability between test results obtained within a single laboratory in the shortest practical period of time by a single operator with a specific set of test

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   14
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO   Document 50   Filed 09/14/15   Page 39 of 58

**D 5572 – 95 (Reapproved 1999)**

apparatus using test specimens taken at random from a single sample of material. (See X1.1.6 of Practice E 177.)

X2.1.4 *reproducibility, n*—a general term for a measure of precision applicable to the variability between single test results obtained in different laboratories using test specimens taken at random from a single sample of material. (See X1.1.7 of Practice E 177.)

X2.2  The following excerpts from Practice E 177 express indexes in percent, and also explain both the preferred types of precision and the preferred indexes, as well as the recommended terminology for preferred indexes. Note that $CV\%_r$ and $CV\%_R$ are larger than the coefficient of variation historically used. See Note 12.

X2.2.1 *Indexes in Percent*—In some instances (see section 28.5 of Practice E 177) there may be some advantage in expressing the precision index as a percentage of the average test results; that is, percent coefficient of variation ($CV\%$). The notation may then be ($CV\%$) ($2CV\%$), ($d2CV\%$), etc. (See 27.3.5 of Practice E 177.)

X2.2.2 *Preferred Types of Precision and Preferred Indexes*—The types of precision described in 23.1.3 and 25.1, namely, repeatability and reproducibility, are the preferred types of precision statements for ASTM test methods. The preferred index for each of these types is the 95 % limit on the difference between the two test results (see section 27.3.3 of Practice E 177), namely, 2.8 s or 2.8 $CV\%$. Also the corre-

sponding standard deviation(s) or percent coefficient of variation ($CV\%$) shall be indicated. (See 28.1 of Practice E 177.)

X2.2.3 *Recommended Terminology for Preferred Indexes* —r = 95 % repeatability limit, and R = 95 % reproducibility limit.

X2.2.3.1  To help prevent confusion between the r and R, use r = 95 % repeatability limit (within a laboratory), and R = 95 % reproducibility limit (between laboratories).

X2.2.3.2  Similarly, the recommended terminology for the corresponding standard deviations is: $s_r$ = repeatability standard deviation (within a laboratory), and $s_R$ = reproducibility standard deviation (between laboratories). For the coefficients of variation $CV\%_r$ = repeatability coefficient of variation in percent (within a laboratory), and $CV\%_R$ reproducibility coefficient of variation in percent (between laboratories).

where:

$r = 1.960 \sqrt{2} s_r = 2.8 s_r$ or $r = 1.960 \, 2CV\%_r = 2.8CV\%_r$, and
$R = 1.960 \sqrt{2} s_R = 2.8 s_R$ or $R = 1.960 \, 2CV\%_R = 2.8CV\%_R$

depending on how the indexes vary with the test level (see section 28.5 of Practice E 177.)

X2.2.3.3  For other than the preferred types, the more general terminology "95 % limit" may be used with the sources of variability, for example: 95 % limit (operator-to-operator, within-laboratory), and similarly for the corresponding standard-deviation: operator-to-operator within laboratory standard deviation (see section 28.2 of Practice E 177.)

---

### X3.   EXCERPT FROM TEST METHOD D 4688

X3.1  The following excerpt was taken from Annex A1 of Test Method D 4688. Although it was mandatory information in Test Method D 4688, it is published here as nonmandatory background information on the various classifications of wood failure in finger joints broken in tension:

X3.1.1 The types of failure that occur in finger-jointed specimens due to tension loading may be roughly classified into six modes. Determine the failure mode of each specimen based on the written and graphical description given in Fig. X3.1.

X3.1.2  Failure Modes 1 and 2 require the evaluator to make a distinction between less than 70 % wood failure and more than 70 % wood failure. This is often a difficult quantity to judge from an oblique angle. In difficult cases it is suggested that the fingers be cut off at their roots so that the failed surfaces of the finger can be viewed directly.

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   15
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

D 5572 – 95 (Reappproved 1999)



| Mode | Description | Example |
|------|-------------|---------|
| 1 | Failure mostly along the bondline surfaces of the joint profile with poor wood failure of any kind (wood failure < 70%). | |
| 2 | Failure mostly along the bondline surfaces of the joint profile with good wood shear failure (wood failure > 70%). | |
| 3 | Failure mostly along the joint profile but with some failure at the finger roots or scarf tips. Good overall wood shear failure along the joint profile surfaces. | |
| 4 | Mostly tensile wood failure at the fingerjoint roots or scarf tips and with high overall wood failure. Little failure of any kind along the joint profile. | |
| 5 | Failure beginning at the joint (possibly due to a stress riser) and progressing away from the joint. Essentially 100% wood failure. | |
| 6 | Failure away from the joint (not influenced by the joint)--all wood failure. | |

**FIG. X3.1 Failure Mode Criteria**

## X4. EXCERPT FROM PRACTICE D 5266

X4.1 The following excerpt was taken from the sections of Practice D 5266 as shown, with the source of each sub-section given following the text:

| Section | Heading |
|---------|---------|
| 5 | Apparatus |
| 6 | Preparation of Specimen |
| 7 | Procedure |
| 8 | Evaluation of Wood Failure |

NOTE X4.1—Practice D 5266 was written primarily with plywood or a laminate-bonded joint in mind, but many of the directions also apply to reading the wood failure of finger joints.

X4.1.1 *Apparatus*—A dual-element desk lamp equipped with one 15-W daylight and one 15-W cool white tube is recommended as a light source. (See 5.1.1 of Test Method D 5266.)

X4.1.2 *Preparation of Test Specimens*—Do not estimate the wood failure percentage of specimens with localized defects such as knots, knotholes, burl, and voids in the bonded area. (See 6.2 Test Method D 5266.)

X4.1.3 *Procedure*:

X4.1.3.1 Work in a location where direct outside light does not fall on the specimen. (See 7.1 of Test Method D 5266.)

X4.1.3.2 Select a light source and use it consistently. (See 7.2 of Test Method D 5266.)

X4.1.3.3 When reading wood failure on finger joints, hold the specimen with the length of the fingers perpendicular to the line between the light source and the eye. (See 7.4.3 of Test Method D 5266.)

X4.1.3.4 Dyes are sometimes helpful in distinguishing wood failure from light-colored adhesive. (See 7.6.1 of Test Method D 5266.)

X4.1.3.5 Magnification, rotation of the specimen, and variation of the incident angle of the light on the surface are often

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   16
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:14-cv-05262-WHO Document 50 Filed 09/14/15 Page 41 of 58

**D 5572 – 95 (Reappproved 1999)**

necessary to distinguish shallow wood failure from adhesive failure, especially when the adhesive is light colored or transparent. Magnification may or may not be used to make the actual estimate of wood failure, however the practice should be consistent. After rotation always reposition the specimen to the standard position before making the estimate of wood failure. (See 7.6.2 of Test Method D 5266.)

X4.1.3.6 Mentally divide the surface into quadrants for estimating the areas of various forms of failure. (See 7.1 of Test Method D 5266.)

X4.1.3.7 Estimate total wood-fiber failure of each specimen to the nearest 5 %, with a maximum of 100 % of the total bonded test area. (See 7.11 of Test Method D 5266.)

X4.1.4 *Evaluation of Wood Failure*:

X4.1.4.1 For accuracy and consistency special care must be taken in the middle range from 30 to 85 %, where most of the difficulty occurs. (See 8.1 of Test Method D 5266.)

X4.1.4.2 The color of the adhesive and recognition of shallow wood failure affect the estimate. (See 8.2 of Test Method D 5266.)

X4.1.4.3 If the percentage of wood failure is high and the failure is mostly on the side of the adhesive layer, the grain orientation may be a factor. (See 8.3 of Test Method D 5266.)

X4.1.4.4 Record any indications of poor spread, lack of adhesive transfer, or other bonding problems. (See 8.4 of Test Method D 5266.)

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Fri Sep 11 15:34:10 EDT 2015   17
Downloaded/printed by
Quynh Vu (none) pursuant to License Agreement. No further reproductions authorized.

EXHIBIT 5

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT and LINDA HOEKMAN, on            No.  2:14-cv-01581-TLN-KJN
     behalf of themselves and all others
12   similarly situated,

13                     Plaintiffs,           **ORDER GRANTING DEFENDANT'S**
                                             **MOTION TO COMPEL ARBITRATION**
14        v.                                 **AND DISMISS**

15   TAMKO BUILDING PRODUCTS, INC.,

16                     Defendant.

17

18        This matter is before the Court pursuant to Defendant Tamko Building Products, Inc.'s

19   ("Defendant" or "Tamko") Motion to Compel Arbitration and Dismiss.  (ECF No. 11.)  Plaintiffs

20   Robert and Linda Hoekman ("Plaintiffs") have filed an opposition to Defendant's motion.  (ECF

21   No. 17.)  The Court has carefully considered the arguments raised in Defendant's motion and

22   reply, as well as Plaintiffs' opposition.  For the reasons set forth below, the Court dismisses

23   Plaintiffs' claims so that they may be addressed in arbitration as required by the arbitration clause

24   in the limited warranty ("Limited Warranty") accompanying Defendant's product.

25   **I.       FACTUAL AND PROCEDURAL BACKGROUND**

26        In February 2006, Plaintiffs had Tamko[1] shingles installed on their home in Truckee,

27

28   _____
     [1]     Tamko Building Products, Inc. claims to be "a leading independent manufacturer of residential and
     commercial building products[.]"  (Compl., ECF No. 1 at ¶ 31.)

                                            1

1   California by Truckee River Roofing.  (Compl., ECF No. 1 at ¶ 21.)  Plaintiffs allege that they

2   purchased Defendant's shingles instead of those from other manufacturers because of

3   Defendant's representations in its advertising and marketing materials, particularly that

4   Defendant's shingles would be free from defects for fifty years.  (ECF No. 1 at ¶ 23.)  Plaintiffs

5   indicate that the packaged shingles were delivered directly into the care of the contractors

6   working on their home.  (ECF No. 17 at 10.)  They argue, therefore, that they never saw nor

7   agreed to any arbitration clause.  (ECF No. 17 at 10.)

8        In August 2013, Plaintiffs state that they discovered their shingles were severely cracking,

9   blistering, and prematurely failing, and that there was significant granule loss on parts of their

10  roof.  (ECF No. 1 at ¶ 24.)  Plaintiffs allege that they contacted Defendant and received a

11  warranty claim form to be completed and returned along with photographs and other supporting

12  documentation.  (ECF No. 1 at ¶ 25.)  Plaintiffs further state that they promptly returned the

13  warranty claim form, complete with photographs, to Defendant on September 13, 2013.  (ECF

14  No. 1 at ¶ 25.)  On or about October 10, 2013, Plaintiffs state that they received a letter from

15  Defendant containing a "Tamko Warranty Claim Settlement Work Sheet[,]" a "Material

16  Certificate" that prorated forty squares of the same shingles Plaintiffs had purchased previously,

17  and a copy of the Limited Warranty.  (ECF No. 1 at ¶ 26.)  Plaintiffs also received a check for

18  one-hundred dollars, which they subsequently cashed.  (Def. Mem. of Points and Authorities in

19  Supp. of Mot. to Compel and Dismiss, ECF No. 12 at 14.)

20        On July 3, 2014, Plaintiffs filed a class action complaint against Defendant seeking

21  declaratory, monetary, and injunctive relief for violations of California Business and Professions

22  Code Sections 17200 and 17500; a violation of the California Consumer Legal Remedies Act;

23  and negligence, negligent design, and negligence per se.  (ECF No. 1.)  Plaintiffs allege that

24  Tamko used less than the required amount of asphalt in its shingles, resulting in their premature

25  deterioration.  (ECF No. 1 at ¶ 11.)  Plaintiffs further contend that Tamko knew or should have

26  known of this defect, despite representations indicating that the product met industry standards.

27  (ECF No. 1 at ¶ 16.)

28        On September 15, 2014, Defendant filed the instant motion to compel arbitration and

2

1   dismiss Plaintiffs' complaint on the grounds that Plaintiffs consented to Defendant's Limited

2   Warranty, which included an arbitration clause. (ECF No. 11.) Plaintiffs argue that they did not

3   learn of the Limited Warranty until after they contacted Defendant about the damaged shingles in

4   August 2013. (ECF No. 1 at ¶ 27.) They assert that, had they known about the Limited

5   Warranty's provisions, they would not have had Defendant's shingles installed at their home.

6   (ECF No. 1 at ¶ 28.)

7        **II.     STANDARD OF LAW**

8        "[T]he federal law of arbitrability under the Federal Arbitration Act ("FAA") governs the

9   allocation of authority between courts and arbitrators." *Cox v. Ocean View Hotel Corp.*, 533 F.3d

10  1114, 1119 (9th Cir. 2008). There is an "emphatic federal policy in favor of arbitral dispute

11  resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 631 (1985). As

12  such, "any doubts concerning the scope of arbitrable issues should be resolved in favor of

13  arbitration, whether the problem at hand is the construction of the contract language itself or an

14  allegation of waiver, delay, or a like defense to arbitrability." *Id*. at 626 (quoting *Moses H.*

15  *Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

16       Generally, in deciding whether a dispute is subject to an arbitration agreement, the Court

17  must determine: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

18  agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207

19  F.3d 1126, 1130 (9th Cir. 2000). As such, the Court's role "is limited to determining arbitrability

20  and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the

21  arbitrator." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 479 (9th Cir. 1991).

22       "In determining the existence of an agreement to arbitrate, the district court looks to

23  'general state-law principles of contract interpretation, while giving due regard to the federal

24  policy in favor of arbitration.'" *Botorff v. Amerco*, No. 2:12-cv-01286, 2012 WL 6628952, at *3

25  (E.D. Cal. Dec. 19, 2012) (citing *Wagner v. Stratton*, 83 F.3d 1046, 1049 (9th Cir. 1996)). An

26  arbitration agreement may only "be invalidated by 'generally applicable contract defenses, such

27  as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that

28  derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC*

1   *v. Concepcion*, 131 S. Ct. 1740, 1748 (2011) (quoting *Doctor's Assocs. Inc. v. Casarotto*, 517

2   U.S. 681, 687 (1996)).  Therefore, courts may not apply traditional contractual defenses like

3   duress and unconscionability, in a broader or more stringent manner to invalidate arbitration

4   agreements and thereby undermine FAA's purpose to "ensur[e] that private arbitration

5   agreements are enforced according to their terms."  *Id*. at 1748 (quoting *Volt Info. Scis., Inc. v.*

6   *Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

7          If a court ". . . determines that an arbitration clause is enforceable, it has the discretion to

8   either stay the case pending arbitration, or to dismiss the case if all of the alleged claims are

9   subject to arbitration."  *Delgadillo v. James McKaone Enters., Inc.*, No. 1:12-cv-1149, 2012 WL

10  4027019, at *3 (E.D. Cal. Sept. 12, 2012.)  The plain language of the FAA provides that the Court

11  should "stay the trial of the action until such arbitration has been had in accordance with the terms

12  of the agreement . . . ." 9 U.S.C. § 3.  However, "9 U.S.C. § 3 gives a court authority, upon

13  application by one of the parties, to grant a stay pending arbitration, but does not preclude

14  summary judgment when all claims are barred by an arbitration clause.  Thus, the provision does

15  not limit the court's authority to grant dismissal in the case."  *Sparling v. Hoffman Constr. Co.*,

16  864 F.2d 635, 638 (9th Cir. 1988).

17  **III.      ANALYSIS**

18         Defendant moves the Court for an order compelling Plaintiffs to submit their claims to

19  arbitration on an individual basis and to dismiss the proceeding.  (ECF No. 12 at 5.)

20         Defendant argues that Plaintiffs' Complaint should be dismissed because, by retaining the

21  Tamko shingles, Plaintiffs agreed to the mandatory arbitration clause that was printed on the

22  packaging as part of the Limited Warranty.  (ECF No. 12 at 11.)  Plaintiffs dispute that a valid

23  arbitration agreement exists.  (ECF No. 17 at 3.)  Therefore, as a threshold issue, the Court will

24  address Plaintiffs' arguments to determine whether a valid arbitration agreement exists.

25              **A.  Existence of a Valid Arbitration Agreement**

26         In making a determination to compel arbitration, the Court "should apply ordinary state-

27  law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d

28  11656, 1170 (9th Cir. 2003).  Under California law, a valid contract requires: (1) parties capable

4

of contracting; (2) mutual consent; (3) a lawful object; and (4) sufficient cause or consideration.
Cal. Civ. Code § 1550.  Plaintiffs argue that they did not consent to the terms of the Limited
Warranty, including the arbitration agreement.  Nevertheless, the Court finds the arbitration
agreement enforceable for the following reasons.

> 1.  <u>Plaintiffs were aware or should have been aware of the arbitration
> agreement at the time of purchase.</u>

Plaintiffs argue that they were not aware of the arbitration terms at the time of purchase,
therefore they did not agree to them.  (ECF No. 17 at 10.)  They claim they were deprived of the
opportunity to view and reject the terms prior to purchase, because the terms were not presented
until the Tamko shingles had already been purchased and delivered.  (ECF No. 17 at 10.)
However, Plaintiffs acknowledge having performed comparison shopping prior to their purchase
of Defendant's shingles.  (ECF No. 1 at ¶ 23.)  Defendant argues that during this process of
comparison shopping, Plaintiffs became aware of the terms, and therefore agreed to them by
proceeding with the purchase. (ECF No. 24 at 4.)  The Court finds sufficient evidence to conclude
that Plaintiffs became familiar with the terms of the Limited Warranty.

In their Complaint, Plaintiffs state that "prior to purchase, [they] compared Tamko's
shingles to those of other manufacturers and decided to purchase Tamko shingles based on the
representations contained in advertising and marketing materials, specifically that the shingles
would be free from defects for fifty years."  (ECF No. 1 at ¶ 23.)  According to the declaration[2]
Defendant submitted in support of its motion, these marketing materials contained references to
the Limited Warranty, and directed readers to the Tamko website in order to view its full terms.[3]

---

[2] Defendant submits the declaration of Titia Miller (ECF No. 19) as support for its motion to compel arbitration.  The declaration makes a number of assertions regarding Tamko's warranties and marketing materials, apparently based on Ms. Miller's expertise as Corporate Manager for Customer Service and Sales Administration.

[3] Defendant includes a brochure, which the declaration asserts is identical to the brochure Tamko used during 2005, the year Plaintiffs purchased their shingles. (ECF No. 19 at ¶ 16.)  On the final page of the brochure, readers are advised to either contact a Tamko representative or visit the Tamko website in order to view the terms of the Limited Warranty.  (ECF No. 12, Attach. 5 at 9.)  Plaintiffs specifically reference using Tamko brochures during the process of shopping for the shingles.  (ECF No. 1 at ¶ 22.)

(ECF No. 19 at ¶ 9–10, 12.)  While there is no direct evidence that Plaintiffs viewed the terms as provided on Tamko's website, Plaintiffs' own statements indicate that Plaintiffs knew or should have known about the Limited Warranty prior to purchase.  For example, Plaintiffs claim in the Complaint that Tamko represented its shingles as being "free of defects for 50 years" (ECF No. 1 at ¶ 7), Defendant counters that "[r]eferences that TAMKO has made to the term '50 years' in its advertisements and marketing materials are in the context of advertising its '50-Year Limited Warranty.'"  (ECF No. 19 at ¶ 14.)

The evidence indicates that Plaintiffs had notice of the Limited Warranty governing the shingles when they viewed the marketing materials and then proceeded to make the purchase.  Such conduct suggests an agreement to the terms.  "[A] 'contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.'"  *Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 421 F.3d 981, 987 (9th Cir. 2005) (quoting Cal. Com.Code § 2204(1)).  Whether or not the Plaintiffs actually read the warranty is irrelevant.  *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept [the contract] take the risk that the unread terms may in retrospect prove unwelcome.").  By their own admission, Plaintiffs reviewed marketing materials that contained references to the Limited Warranty and information about how to locate its terms.  "The party seeking to compel arbitration bears the burden of establishing the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Long John Silver's Restaurants, Inc.*, 320 F. Supp. 2d 656, 664 (M.D. Tenn. 2004) *aff'd*, 414 F.3d 583 (6th Cir. 2005); *Toal v. Tardif*, 178 Cal. App. 4th 1208, 1219 (2009).  The Court finds by a preponderance of the evidence that Defendant has shown Plaintiffs knew or should have known about the arbitration agreement prior to purchase, and therefore accepted its terms by making the purchase.

2. <u>Defendant offers sufficient evidence for the existence of the terms on the shingles.</u>

Even if Plaintiffs did not have notice of the terms of the Limited Warranty prior to purchase, the arbitration agreement is still enforceable.  First, there is sufficient evidence that an arbitration agreement accompanied the shingles delivered to the contractors.

Defendant provided three versions of the Limited Warranty that accompanied its shingles throughout different years.  Plaintiffs argue that Defendant cannot establish which of the three versions of the Limited Warranty accompanied the shingles that were installed on their home.  (ECF No. 17 at 17–19.)  One of the versions, which states that it applies to all shingles sold after January 1, 2003, does not contain the arbitration agreement.  (ECF No. 17, Attach 7.)  Plaintiffs suggest that this could have been the version that accompanied the shingles installed on their home.  The two other versions purport to apply to all Tamko shingles sold after December 1, 2004, and December 1, 2005, respectively.  (ECF No. 17, Attach. 6–7.)  Except for the dates, these latter two versions are identical, and both contain the mandatory arbitration agreement.

The shingles were installed on Plaintiffs' home in February, 2006.  Though neither party provides a date of purchase, it is more likely than not that the Limited Warranty on the Hoekman's shingles was one of the two later versions, either of which would have contained the mandatory arbitration agreement.  Defendants attached a declaration in support of this conclusion.  (Declaration of Titia Miller, ECF No. 19.)  The declaration states that "TAMKO's entire limited warranty agreement, which includes a mandatory arbitration clause, is printed on the outside of every package of TAMKO shingles—including the TAMKO Heritage 50 Shingles purchased by the Hoekmans."  (ECF No. 19 at ¶ 10.)  The declaration identifies the 2004 warranty, which was attached to the Motion to Compel Arbitration, as having been printed on the Hoekman's shingles. (ECF No. 19 at ¶ 9.)  Defendant has proved by a preponderance of the evidence that the Hoekman's shingles were accompanied by the mandatory arbitration agreement.

3. <u>Defendant offers sufficient evidence that the terms are properly presented.</u>

Plaintiffs argue that as the "ultimate purchasers" of the shingles, their pre-purchase acceptance of the terms was somehow required.[4] (ECF No. 17 at 10.)  However, case law indicates that whether or not the purchaser reads the terms included with the product, either before or after purchase, such terms are enforceable.

The terms of the arbitration clause were printed on the outside of each package of Tamko shingles.  (ECF No. 19 at ¶ 10.)  Numerous cases support the validity of this method of providing arbitration terms post-purchase, which is comparable to the shrinkwrap licenses that frequently accompany purchases of computer software.[5]  In general, "contracts contained in [] boxes…are no less enforceable than any other kind of contract."  *Novell, Inc. v. Unicom Sales, Inc.*, No. 03-cv-2785 MMC, 2004 WL 1839117, at *11 (N.D. Cal. Aug. 17, 2004) (citing *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996)).  "The weight of authority…is that shrinkwrap licenses are enforceable."  *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974, 989 (N.D. Cal. 2010).  Courts have repeatedly upheld arbitration provisions that come in the form of shrinkwrap agreements.  *See, e.g., Herron v. Best Buy Stores, Inc.*, 924 F.Supp.2d 1161 (E.D. Cal. 2014).  In light of this precedent, the Court concludes that Tamko delivered the arbitration agreement in a legally valid manner.

Plaintiffs also argue that the arbitration agreement is not enforceable because its terms

---

[4] Plaintiffs make this argument on the basis of the holding in *Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 421 F.3d 981 (9th Cir. 2005). In *Arizona Cartridge*, the Ninth Circuit upheld the terms printed on the outside of an ink cartridge box, in part because buyers had an opportunity to view them prior to purchase. *Id.* at 987.

[5] "The 'shrinkwrap license' gets its name from the fact that retail software packages are covered in plastic or cellophane 'shrinkwrap,' and some vendors…have written licenses that become effective as soon as the customer tears the wrapping from the package." *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996).  Typically, the shrinkwrap license is contained on the outside of the product's packaging, or contained within the box.  *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 988 (N.D. Cal. 2010); *ProCD*, 86 F.3d at 1449.

were not "clearly marked" on the packaging and that they cannot be found to have consented to

language they could not reasonably have been expected to read. (ECF No. 17 at 10.)  The Court

finds no specific standard for the visibility of terms appearing on packaging.  Ultimately,

Plaintiffs are disputing the conspicuousness of the arbitration agreement, so the Court looks to the

California Commercial Code's definition of the term.  "Conspicuous," with reference to a term,

means so written, displayed, or presented that a reasonable person against which it is to operate

ought to have noticed it."  Cal. Com. Code § 1201.  The Code also provides that "[w]hether a

term is 'conspicuous' or not is a decision for the court."  *Id*.  As it appears on copies of the

Limited Warranty provided by Defendant, the arbitration agreement satisfies this definition.

(ECF No. 12, Attach. 1–4.)  Within the most prominent section of the label, a warning in large

type references the warranty and states that it is printed elsewhere on the wrapper.  (ECF No. 12,

Attach. 3.)  In a nearby section of the label, the heading 'Mandatory Binding Arbitration' appears

in boldface type, with a description of the terms immediately underneath. (ECF No. 12, Attach.

4.)

     The Court finds that the terms were sufficiently visible to satisfy the unofficial standard

set by previous cases.[6]  The Court therefore holds that the terms of the arbitration provision were

presented in such a way as to create an enforceable agreement when the shingles were received

and retained by Plaintiffs' contractors.[7]

///

---

[6] Furthermore, the Supreme Court held in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 688 (1996), that the Federal Arbitration Act preempted a state law setting special prominence requirements on arbitration clauses. Therefore, Plaintiffs' argument that the arbitration agreement was not adequately conspicuous is based on a standard of their own creation and is thus unavailing.

[7] Defendant argues an alternative basis for finding that Plaintiffs agreed to the Limited Warranty.  Defendant claims that by submitting a Limited Warranty Claim Form after experiencing issues with their Tamko shingles, Plaintiffs indicated their acceptance of the Limited Warranty's terms, including the arbitration agreement.  (ECF No. 12 at 13.) Plaintiffs also endorsed and cashed the $100 check they received in return, which Defendant argues constituted their acceptance of a full settlement of their claim.  (ECF No. 12 at 13.)  The Court takes note but reserves ruling on whether these actions by Plaintiffs were sufficient to establish a valid agreement.

4. <u>Contractor's knowledge of the arbitration agreement is imputed to Plaintiffs.</u>

Plaintiffs further maintain that because they did not personally view the arbitration agreement, it does not bind them.  (ECF No. 17 at 10.)  Defendant counters that Plaintiffs consented to the agreement through their contractor.  (ECF No. 24 at 4.)  Relying on Cal. Civ. Code § 2332, Defendant argues that the contractor's role as Plaintiffs' agent meant that his knowledge of the agreement was imputed to them.  (ECF No. 24 at 3–4.)  *See* Cal. Civ. Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."); *Faires v. Title Ins. & Trust Co.,* 15 Cal. App. 2d 350, 354 (1936) ("Knowledge acquired by an agent during the agency and within its scope is imputed to the principal.").

"An agent is one who represents another…in dealings with third persons."  *Zimmerman v. Superior Court*, 220 Cal. App. 4th 389, 401 (2013) (quoting Cal. Civ. Code § 2295).  Despite the lack of detail in the pleadings, the Court infers from the Complaint that Truckee River Roofing was working directly for and on behalf of Plaintiffs when it received, opened, and installed the roofing tiles.  (ECF No. 1 at ¶ 21.)  Plaintiffs indicate that they intended the shingles to be delivered directly into the care of Truckee River Roofing.  (ECF No. 17 at 10–11.)  By entrusting the receipt and installation of the shingles to Truckee River Roofing, Plaintiffs indicated that they were authorizing their contractor to represent them in their receipt of the shingles from Tamko.  The Court finds this evidence sufficient to establish implied agency between Plaintiffs and their contractors.  *Zimmerman*, 220 Cal. App. 4th at 401 ("Agency may be implied based on conduct and circumstances."); *Whittaker v. Otto*, 188 Cal. App. 2d 619, 622–23 (Ct. App. 1961) ("Agency may… be proven by circumstantial evidence, including evidence of the acts of the parties[.]").  Within the scope of the receipt and installation of the shingles, Truckee River Roofing was indeed

10

1   acting as an agent for Plaintiffs.

2         Because the Court finds that an agreement was established between Tamko and the

3   contractor when the packaged tiles were delivered, the agreement binds Plaintiffs as well.  "It is

4   also well-settled law in this state that notice given to or possessed by an agent within the scope of

5   his employment and in connection with, and during his agency is notice to the principal." *Early*

6   *v. Owens*, 109 Cal. App. 489, 494 (1930).  That the contractor did not convey the terms of the

7   Limited Warranty to Plaintiffs is moot.  "The fact that he may or may not have reported this

8   information to his principal is immaterial, for he was acting in the course of his employment and

9   the principal was charged with knowledge of information acquired by him in the transaction of

10  her business." *Granberg v. Turnham*, 166 Cal. App. 2d 390, 395 (1958).

11        Defendant provides reference to two recent cases in which courts have upheld this

12  particular arbitration agreement.  In *Krusch v. TAMKO Bldg. Products, Inc.*, 34 F. Supp. 3d 584,

13  594 (M.D.N.C. 2014), the district court found that the plaintiff had agreed to the arbitration clause

14  because he had constructive notice through his contractor, who the court held was acting as his

15  agent.  Tamko had produced evidence that the plaintiff's contractor had received a sample shingle

16  that was stamped with language referencing the Limited Warranty, as well as brochures.  *Id*. at

17  589.

18        In *Overlook Terraces, Ltd. V. TAMKO Building Products, Inc.*, No. 3:14-cv-00241-CRS,

19  slip op. (W.D. Ky. July 27, 2015), a Kentucky district court held that the terms of the limited

20  warranty were binding on the building owner, despite their lack of actual knowledge.[8]  The court

21  noted that the language of the warranty specifically applies to the owner of the building upon

22  which the shingles were installed.  (ECF No. 32, Attach. 1 at 7.)  Therefore, the owner had the

---

[8] The Report and Recommendation made by the magistrate judge (ECF No. 32, Attach. 1) were adopted in full by Senior Judge Charles R. Simpson III on July 27, 2015.  Judge Simpson's Order, which compels binding arbitration and stays the proceedings, is included in Defendant's notice of supplemental authority.  (ECF No. 33.)

11

1  burden of proving that the arbitration agreement should not apply.  The district court found that

2  the owner failed to meet this burden, rejecting the plaintiff's arguments that he received

3  insufficient notice of the agreement and that Tamko had waived its right to enforce it.  (ECF No.

4  32, Attach. 1 at 7.)

5

6          In these two cases, district courts upheld the arbitration agreement when contractors

7  shopped for and eventually installed the shingles without the owner-plaintiffs ever seeing the

8  marketing materials or the warranty.  Here, Plaintiffs' connection to the Limited Warranty is even

9  closer, because they personally shopped for and purchased the shingles.  The aforementioned

10  Tamko cases, in addition to general principles of agency, provide sufficient support for the

11  enforcement of the arbitration agreement.  Holding for the Plaintiffs would mean that purchasers

12  can deny unwanted terms, as long as they avoid reading them prior to purchase and then have the

13  product delivered to someone else.  With good reason, prior courts have rejected this outcome.

14  Similarly, this Court finds that Plaintiffs' alleged lack of actual notice is not enough to overturn

15  the valid arbitration agreement.

16

17

18              **B.   The Instant Dispute is within the Scope of that Agreement**

19          Given the Court's finding that there is a valid arbitration agreement, the question then

20  becomes "whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho*

21  *Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  Although Plaintiffs argue there was

22  not a valid arbitration agreement, they do not contest that if the Court were to find an agreement

23  their claims would fall within its scope.

24          The Limited Warranty requires Plaintiffs and Defendant to arbitrate "every claim,

25  controversy, or dispute of any kind whatsoever…relating to or arising out of the shingles or this

26  limited warranty[.]"  (ECF No. 12 at 6.)  Plaintiffs' claims arise out of both the shingles

27  themselves and Tamko's representations of them.[9]  Because the broad language of the arbitration

28
---
[9] Plaintiffs allege violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), the
California False Advertising Law (Cal. Bus. & Prof. Code § 17500), and the California Consumer Legal Remedies

1   agreement encompasses any claims "relating to or arising out of" the shingles, all aspects of the

2   instant dispute fall within its scope.

3     The Limited Warranty also contains a provision that requires Plaintiffs to arbitrate

4   individually and prohibits Plaintiffs from seeking class treatment without a previous written

5   agreement between Defendant and Plaintiffs.  (ECF No. 12 at 6.)  Class action waivers contained

6   within arbitration agreements are valid and enforceable.  *See generally AT&T Mobility LLC v.*

7   *Concepcion*, 131 S. Ct. 1740 (2011).  Therefore, Plaintiffs must pursue their claims on an

8   individual basis through arbitration.

9       **C.  The Arbitration Agreement is Not Unconscionable**

10     Plaintiffs argue that the arbitration agreement is unenforceable on the basis of

11   unconscionability.  (ECF No. 17 at 5.)  California courts apply a "sliding scale" analysis in

12   making determinations of unconscionability: "the more substantively oppressive the contract

13   term, the less evidence of procedural unconscionability is required to come to the conclusion that

14   the term is unenforceable and vice versa." *Kilgore v. Keybank, Nat'l Ass'n*, 673 F.3d 947, 963

15   (9th Cir. 2012) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114

16   (2000)).  "No matter how heavily one side of the scale tips, however, both procedural and

17   substantive unconscionability are required for a court to hold an arbitration agreement

18   unenforceable." *Kilgore*, 673 F.3d at 963 (quoting *Armendariz*, 24 Cal. 4th at 89).  The Court

19   must apply this balancing test to determine if the arbitration agreement is unenforceable.  As the

20   party opposing arbitration, Plaintiffs bear the burden of proving unconscionability by a

21   preponderance of the evidence.  *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972

22   (1997).  The Court finds Plaintiffs have not met this burden for the following reasons.

23       1.  Procedural Unconscionability

24

25     Plaintiffs assert that the arbitration agreement is procedurally unconscionable because

26

27   ―――――――――――――――――――――――――――――――――――――――

28   Act, as well as negligence.  (ECF No. 1 at 2.)  They file a class action seeking damages and declaratory relief on
behalf of themselves and others similarly situated.  (ECF No. 1 at ¶ 37.)

they were not presented with its terms prior to purchase.  (ECF No. 17 at 8.)  They claim they did

not receive a copy of the Limited Warranty until it was mailed to them in 2013 as part of Tamko's

settlement offer package.  (ECF No. 17 at 8.)[10]  In evaluating procedural unconscionability under

California law, courts "focu[s] on the factors of surprise and oppression in the contracting

process, including whether the contract was one drafted by the stronger party and whether the

weaker party had an opportunity to negotiate."  *Pokorny v. Quixtar*, 601 F.3d 987, 996 (9th Cir.

2010).

Oppression arises "from an inequality of bargaining power [that] results in no real

negotiation and an absence of meaningful choice."  *Circuit City Stores, Inc. v. Mantor*, 335 F.3d

1101, 1106 (9th Cir. 2003) (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532

(1997)).  As a standardized contract, the terms of which Plaintiffs had no opportunity to negotiate,

the Limited Warranty is by nature an adhesion contract.  Therefore, it is at least moderately

procedurally unconscionable under California law.  *Bridge Fund Capital Corp. v. Fastbucks

Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010)  ("California law treats contracts of

adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to

negotiate, as procedurally unconscionable to at least some degree.").

The lack of a "surprise" element prevents the Court from finding substantial

procedural unconscionability.  Surprise "involves the extent to which the contract clearly

discloses its terms as well as the reasonable expectations of the weaker party," *Chavarria v.

Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013).  As described above, the arbitration

agreement was clearly visible and provided in a manner consistent with similar agreements

---

[10] Rather than perform their own procedural analysis, Plaintiffs advocate for the Court to accept the reasoning of a
South Carolina district court that recently found Tamko's warranty unconscionable in *One Bell Hall Property
Owners Association, Inc., et al., v. Trammell Crow Residential Company, et al.*, No. 2012-CP-10-7594.  (ECF No.
17, Attach. 1.)   In *One Belle Hall*, the court found that numerous sections of the Limited Warranty were
unconscionable, focusing primarily on provisions that were unrelated to arbitration.  (ECF No. 17, Attach. 1 at 3–4.)

previously upheld by courts.  Additionally, Plaintiffs had the opportunity to view the entire

Limited Warranty, including the arbitration agreement, prior to purchase.  Therefore, the

agreement is not procedurally unconscionable.

### 2.  Substantive Unconscionability

Plaintiffs argue that the arbitration agreement is substantively unconscionable because it

denies their right to a jury trial.  (ECF No. 17 at 8.)  In order to prove that this constitutes

substantive unconscionability under California law, Plaintiffs must show that it leads to "'overly

harsh' or 'one-sided' results."  *See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622

F.3d 996, 1004 (9th Cir. 2010) (quoting *Armendariz*, 24 Cal. 4th at 114) ("[S]ubstantive

unconscionability 'focuses on 'overly harsh' or 'one-sided' results.'").   However, the instant

arbitration agreement requires both parties to resolve all disputes through binding arbitration

subject to the rules of the American Arbitration Association.  (ECF No. 24 at 10.)  Because both

parties must submit to arbitration, this Court finds that the arbitration terms are neither overly

harsh nor one-sided.[11]  Without such a finding, the Court cannot conclude that there is substantive

unconscionability.[12]

In order to render an arbitration agreement unenforceable, California law requires a

finding of both procedural and substantive unconscionability.  *Kilgore*, 673 F.3d at 963.  The

arbitration agreement at issue fails to meet this standard.  Accordingly, the Court holds that the

arbitration agreement is enforceable.

---

[11] This Court held similarly in *Morgan v. Xerox Corp.*, No. 2:13-CV-00409-TLN-AC, 2013 WL 2151656, at *4 (E.D. Cal. May 16, 2013), when it ruled that plaintiff's waiver of the right to a jury trial was not unconscionable because the defendants had also waived that right.

[12] As additional support, Defendant points to two district court cases in which Tamko's arbitration agreement was upheld. In *Krusch v. TAMKO Bldg. Products, Inc.*, 34 F. Supp. 3d 584 (M.D.N.C. 2014), the court determined the arbitration agreement was enforceable and granted Tamko's motion to stay the proceedings.  Similarly, in *Mann v. TAMKO Bldg. Prods., Inc.*, No. 2008 CV 05392, slip op. at 11–12 (Ohio C.P. Ct. Apr. 30, 2009), an Ohio magistrate judge rejected the plaintiff's unconscionability arguments and granted Tamko's motion to stay pending arbitration. Though not dispositive in the instant case, these decisions give additional weight to Defendant's arguments against a finding of unconscionability.

**D.  Motion to Compel Arbitration and Dismiss**

Having concluded that a valid arbitration agreement exists and that the disputes are encompassed within the scope of the agreement, the Court must compel arbitration and either dismiss the action or stay the proceedings.  A district court "has the discretion to either stay the case pending arbitration or to dismiss the case if all of the alleged claims are subject to arbitration."  *Delgadillo v. James McKaone Enterprises, Inc.*, No. 1:12-CV-1149 AWI MJS, 2012 WL 4027019, at *3 (E.D. Cal. Sept. 12, 2012).  The Court concludes that all of Plaintiffs' claims are subject to arbitration, and therefore dismisses Plaintiffs' claims without prejudice.

**IV.     CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's Motion to Compel Arbitration, and DISMISSES Plaintiffs' claims without prejudice so that they can be addressed in arbitration.

IT IS SO ORDERED.

Dated:  August 24, 2015

Troy L. Nunley
United States District Judge

16